**Marc FELDMAN, Appellant,**

v.

**William C. GARDNER, et al.**

**Edward J. HICKEY, Jr., Appellant,**

v.

**DISTRICT OF COLUMBIA COURT OF APPEALS, et al.**

**Nos. 78–2235, 79–1233.**

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 21, 1979.

Decided July 23, 1981.

As Amended Sept. 28, and Oct. 27, 1981.

Robert M. Sussman, Washington, D. C., with whom James A. Toupin, Washington, D. C., was on the brief, for appellant Marc Feldman.

Michael F. Henly, Washington, D. C., with whom Fred F. Fielding and Ingrid M. Olson, Washington, D. C., were on the brief, for appellant Edward J. Hickey, Jr.

Daniel A. Rezneck, Washington, D. C., with whom Abe Krash and Charles H. Cochran, Washington, D. C., were on the brief, for appellees.

Before ROBINSON, Chief Judge, ROBB, Circuit Judge, and DAVIS,* Judge.

Opinion for the Court filed by Chief Judge SPOTTSWOOD W. ROBINSON, III.

Opinion concurring in part and dissenting in part filed by Circuit Judge ROBB.

* Of the United States Court of Claims, sitting by designation pursuant to 28 U.S.C. § 293(a)

(1976).

SPOTTSWOOD W. ROBINSON, III, Chief Judge:

These cases mark the continuing efforts of two lawyers to surmount the single legal barrier to practice of their chosen profession in the District of Columbia. The obstacle they face is posed by Rule 46 I(b) of the District of Columbia Court of Appeals, which specifies that only graduates of law schools accredited by the American Bar Association (ABA), and graduates of other law schools who have taken supplementary courses at an ABA-approved institution, may sit for the District of Columbia bar examination.[1]

Appellants, Edward J. Hickey and Marc Feldman, when intercepted by this proscription, petitioned the District of Columbia Court of Appeals[2] to waive it in their behalf. When the court declined to do so, they brought separate actions in the District Court assailing the validity of Rule 46 I(b) under the Constitution and the federal antitrust laws. In each instance the District Court dismissed the constitutional counts, as well as Feldman's antitrust attack, on the ground that it lacked jurisdiction to entertain them, reasoning that the Court of Appeals' rulings on the applications for waivers were judicial in nature, and as such were reviewable only in the Supreme Court of the United States. Hickey's antitrust suit was dismissed as frivolous.

Careful review of the antitrust arguments advanced by appellants satisfies us

that they are insubstantial, and we affirm their dismissal on this basis. Intensive study of the jurisdictional problem, however, constrains us to conclude that the waiver proceedings were not judicial in the federal sense, and thus did not foreclose litigation of the constitutional contentions in the District Court. We accordingly reverse the dismissals of the constitutional claims and remand them for consideration on the merits.[3]

## I. BACKGROUND OF THE LITIGATION

Prior to the last decade, the District Court supervised admission to the District of Columbia bar.[4] In 1970, Congress enacted the District of Columbia Court Reform and Criminal Procedure Act,[5] by which that function was transferred to the District of Columbia Court of Appeals, together with authority to promulgate regulations governing bar membership.[6] The Court of Appeals subsequently adopted, as part of its general rules, the challenged provision limiting entry to the bar. This contested directive is embodied in Rule 46 I(b), which in pertinent part provides:

(3) *Proof of Legal Education.* An applicant who has graduated from a law school that at the time of graduation was approved by the American Bar Association or who shall be eligible to be graduated from an approved law school within 60 days of the date of the examination

---

1. Rule 46 I(b) is quoted, in relevant part, in text *infra* at note 7. See note 182 *infra*.

2. Hereinafter the District of Columbia Court of Appeals frequently will be referred to simply as "the Court of Appeals." The term "District Court" signifies the United States District Court for the District of Columbia.

3. Although these cases have not been consolidated, see Fed.R.App.P. 3(b), they raise nearly identical legal issues and were argued sequentially on the same day. Consequently, we deal with them in a single opinion. Appellees in No. 79–1233 are the District of Columbia Court of Appeals as an entity and the judges of that court in their official capacities. Appellees in No. 78–2235 are the chairman and the secretary of the Committee on Admissions of the

District of Columbia Bar, the Committee itself, and the judges of the Court of Appeals, each of whom is sued in his or her official capacity. See note 61 *infra*.

4. See Act of Apr. 19, 1920, ch. 153, 41 Stat. 561 (1920); *Austin v. Municipal Court*, 98 U.S.App. D.C. 339, 340, 235 F.2d 836, 837 (1956), *cert. denied*, 353 U.S. 923, 77 S.Ct. 682, 1 L.Ed.2d 720 (1957); *Brooks v. Laws*, 92 U.S.App.D.C. 367, 371, 208 F.2d 18, 22 (1953).

5. Act of July 29, 1970, Pub.L.No. 91–358, 84 Stat. 473, codified in relevant part at D.C.Code § 11–2501 (1973).

6. *Id.* § 111, 84 Stat. 521 (1970), codified in relevant part at D.C.Code § 11–2501 (1973).

will be permitted to take the bar examination. Under no circumstances shall an applicant be admitted to the bar without having first submitted to the Secretary to the Committee [on Admissions] a certificate verifying that he has graduated from an approved law school.

. (4) *Law Study in a Law School NOT Approved by the ABA.* An applicant who graduated from a law school not approved by the American Bar Association may be permitted admission to an examination only after receiving credit for 24 semester hours of study in a law school that at the time of study was approved by the American Bar Association and with Committee approval.[7]

This rule blocks both appellants, as presently circumstanced, from essaying to pass the District of Columbia bar examination.[8]

### A. *Appellant Hickey*

Following a career in the United States Navy, Hickey entered the Potomac School of Law in March, 1975.[9] He was aware that Potomac was not then accredited by ABA,[10] but hoped subsequently to transfer to an approved law school.[11] Shortly after he matriculated, however, the Court of Appeals waived Rule 46 I(b)(3)[12] in favor of the 1975 graduates of the International School of Law—another recently established, unaccredited institution—in order to permit them to sit for the bar examination without completing any additional courses.[13] Similar dispensations were later accorded to International's 1976 and 1977 graduating classes.[14]

In light of the indulgence thus extended to International's alumni, Hickey anticipated that upon completion of his studies at Potomac he too would be allowed to take the bar examination.[15] Contrary to his expectations, however, the Court of Appeals, in November of 1977, denied Potomac's petition for a temporary waiver of the rule on behalf of its graduates. Although students who had been graduated from International prior to August, 1977, would be permitted to sit for the bar examination, the court announced its resolve to discontinue exemptions.[16]

On April 18, 1978, Hickey, through his counsel, filed a petition in the Court of Appeals seeking personal exception from the rule.[17] Hickey set forth his academic achievements[18] and attached affidavits from members of the District of Columbia

---

7. D.C.App.R. 46 I(b) (1978). We are told that 33 states in addition to the District of Columbia limit admission to the bar in a similar fashion. Brief for Appellees in No. 78–2235 at 5; Brief for Appellees in No. 79–1233 at 6.

8. It seems, however, that after five years of law practice elsewhere, each appellant may apply for admission to the District of Columbia bar without examination. See note 51 *infra* and accompanying text.

9. Complaint, *Hickey v. District of Columbia Court of Appeals,* Civ. No. 78–1276 (D.D.C., filed July 10, 1978) ¶ 4 [hereinafter cited as Hickey Complaint], Joint Appendix in No. 79–1233 at 8 [hereinafter cited as H. App.]. Because Hickey's case is before us on appeal from the grant of a motion to dismiss, we take as true all well-pleaded allegations of the complaint, bearing in mind that a "complaint should not be dismissed unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80, 84 (1957).

10. Hickey Complaint, *supra* note 9, ¶ 6, H. App. 9.

11. *Id.*

12. Quoted in text *supra* at note 7.

13. Hickey Complaint, *supra* note 9, ¶ 6, H. App. 9.

14. *Id.*

15. *Id.* ¶ 7, H. App. 9.

16. *Id.*

17. Special Petition for a Waiver of District of Columbia Court of Appeals Rule 46 I(b)(3) [hereinafter cited as Hickey Petition], H. App. 16.

18. *Id.* at 1–2, H. App. 17–18. See also *id.* Exhibit (Ex.) A (law school transcript), H. App. 24.

bar attesting to his competence.[19] He urged that application of the newly-stated nonwaiver policy against him would be unfair, explaining that he had not anticipated it and that its enforcement would work particular hardship because he was then unemployed and the sole support of his wife and children.[20] Hickey's petition also alleged, on information and belief, that ABA policies precluded him from gaining admission to an accredited law school in order to qualify under the provisions of Rule 46 I(b)(4).[21] On June 12, 1978, the Court of Appeals denied Hickey's petition in what was styled as a per curiam order.[22] The court stated that ABA standards "permit enrollment of persons in petitioner's category"[23] in accredited law schools, but did not respond to any of the other grounds advanced by Hickey in support of his waiver request.

Hickey then brought his action in the District Court. There he alleged that the Court of Appeals acted arbitrarily and capriciously in refusing him a waiver;[24] that Rule 46 I(b) contravenes both the equal protection and due process components of the Fifth Amendment;[25] and that appellees have unreasonably restricted entry into the legal profession, united in a combination in restraint of trade, attempted to monopolize and actually monopolized the practice of law in the District of Columbia, in violation of Sections 1 and 2 of the Sherman Act[26] and caused appellants to sustain injury to business or property within the meaning of Section 4 of the Clayton Act.[27] An affidavit accompanying the complaint avowed that every ABA-accredited law school in the District of Columbia had been contacted, and that each denied admission to individuals in his situation as a matter of policy, thus making it impossible for him to comply with Rule 46 I(b).[28]

The District Court dismissed the complaint for an asserted lack of jurisdiction.[29] The court held that the Court of Appeals' disposition of Hickey's waiver petition was judicial in character and therefore reviewable only in the Supreme Court.[30] The court further ruled that the antitrust laws did not apply to the type of action under attack.[31] Hickey's appeal followed.

### B. Appellant Feldman

Feldman looked forward to a legal career upon graduation from college, but chose to read for the Virginia bar[32] rather than

---

**19.** *Id.* Exs. B–E, H. App. 25–33.

**20.** *Id.* at 3–6, H. App. 19–22.

**21.** *Id.* at 6, H. App. 22. Rule 46 I(b) is quoted in text *supra* at note 7.

**22.** Hickey Complaint, *supra* note 9, Ex. B, H. App. 35.

**23.** *Id.*

**24.** *Id.* ¶ 11, H. App. 11–12. Although Hickey raised this point before the District Court, he has not pursued it on appeal; indeed his brief repeatedly characterizes his suit as a challenge to the validity of Rule 46 I. See, *e. g.*, Brief for Appellant Hickey at 24. See also note 200 *infra*.

**25.** *Id.* ¶ 11 & prayer for relief, H. App. 11–12, 13–14.

**26.** *Id.* ¶¶ 13, 14, H. App. 13. See Sherman Act, §§ 1, 2, 15 U.S.C. §§ 1, 2 (1976). Section 3 of the Sherman Act applies the antitrust laws in the District of Columbia. 15 U.S.C. § 3 (1976).

**27.** Hickey Complaint, *supra* n. 9, ¶ 15, H. App. 13. See Clayton Act, § 4, 15 U.S.C. § 15 (1976).

**28.** Hickey Complaint, *supra* n. 9, Ex. C, H. App. 41–44.

**29.** *Hickey v. District of Columbia Court of Appeals*, Civ. No. 78–1276 (D.D.C. Dec. 21, 1978) (memorandum order) at 3 [hereinafter cited as *Hickey Order*], H. App. 143. Early on, the court had denied Hickey's motion for a preliminary injunction mandating his admission to the July, 1978, bar examination. *Hickey v. District of Columbia Court of Appeals*, 457 F.Supp. 584 (D.D.C.1978). Hickey appealed that ruling, but this court refused an injunction pending appeal and dismissed the appeal *sua sponte*. *Hickey v. District of Columbia Court of Appeals*, No. 79–1233 (D.C.Cir. July 24, 1978) (order).

**30.** Hickey Order, *supra* n. 29, at 2, H. App. 142.

**31.** *Id.* at 3, H. App. 143.

**32.** Va.Code § 54–62 (1978 rev.) provides:

Preliminary proof of education required of applicant—In addition to the certificate required by §§ 54–60 and 54–61, every applicant before taking any examination under this article shall furnish to the Board satisfactory evidence that such applicant has:

(1) Received a degree or certificate from a law school approved by the American Bar Association, or the Board, or,

attend law school.[33] Under the supervision of the state's Board of Bar Examiners, he began his training with a Charlottesville law firm in October, 1972. In the course of his studies, Feldman formally audited approximately 18 credit hours of classes at the University of Virginia Law School, and he spent the final six months of his apprenticeship as a law clerk to a district judge in this circuit.[34]

Feldman sat for the Virginia bar examination in February, 1976, and was admitted to the Virginia bar in April of that year.[35] From March 1, 1976, until January 1, 1977, he worked as a staff attorney with a legal aid bureau in Baltimore.[36] Maryland, like the District of Columbia, has a rule limiting the bar examination to graduates of ABA-approved institutions,[37] but the state's Board of Law Examiners waived the rule on Feldman's behalf.[38] He subsequently passed the Maryland examination and was admitted to the bar of that state.[39]

Feldman then applied to the Committee on Admissions of the District of Columbia bar for admission pursuant to a then-existent rule allowing a member of a bar of another jurisdiction to seek membership in the District bar without examination.[40] The Committee responded that Feldman's request could not be accepted because he was not a graduate of an accredited law school, and informed him that only the Court of Appeals had authority to make exceptions to this requirement.[41]

On June 13, 1977, Feldman petitioned the Court of Appeals to admit him to the bar without examination or, in the alternative, to permit him to sit for the examination.[42] In support of his application, Feldman set forth in detail his legal experience and training.[43] After several months passed in silence, his counsel, on March 6, 1978, wrote a letter to the Chief Judge of the Court of Appeals, seeking prompt action on the petition. This communication reiterated Feldman's qualifications for admission and suggested for the first time that

> barring Mr. Feldman from the practice of law merely because he has not graduated from an accredited law school would raise important questions under the United States Constitution and the federal antitrust laws—questions that Mr. Feldman is prepared to pursue in the United States District Court if necessary.[44]

Counsel devoted the last three pages of the letter to an outline of legal arguments, advising the Court of Appeals that these grounds would be raised in federal court

(2)(i) Completed at least a three-year academic course of an accredited college and (ii) studied law for at least three years, in the office of an attorney practicing in this State, whose full time is devoted to the practice of law, or studied law for at least three years partly in a law school approved by the American Bar Association or the Board and partly in said practicing attorney's office. The attorney in whose office the applicant intends to study shall be approved by the Board which shall prescribe reasonable conditions as to such course of study.

33. Complaint, *Feldman v. Gardner*, Civ. No. 78–0957 (D.D.C., filed May 26, 1978) ¶ 9 [hereinafter cited as Feldman Complaint], Joint Appendix in No. 78–2235 at 6 [hereinafter cited as F. App.]. As in Hickey's case, we take as true the facts well-pleaded in Feldman's complaint. See note 9 *supra*.

34. *Id.* ¶¶ 10, 12–14, F. App. 6–7.

35. *Id.* ¶ 15, F. App. 7.

36. *Id.* ¶ 16, F. App. 7.

37. *Id.* ¶ 17, F. App. 8.

38. *Id.*

39. *Id.* ¶ 18, F. App. 8.

40. *Id.* ¶ 19, F. App. 8.

41. *Id.* ¶¶ 20–22, F. App. 8–9. The Committee initially advised Feldman that no exceptions were authorized. After an informal hearing, it told Feldman that only the Court of Appeals could waive the rule. See notes 51, 61 *infra*.

42. Petition of Marc Feldman for Admission to the Bar of the District of Columbia Without Examination [hereinafter cited as *Feldman Petition*], F. App. 17.

43. *Id.* ¶¶ 1–7, F. App. 17–19.

44. Letter, Robert M. Sussman to Hon. Theodore R. Newman, Jr., Mar. 6, 1978, at 1, F. App. 23.

should the threatened lawsuit come to pass.[45]

By letter shortly thereafter, the Chief Judge responded.[46] This communication stated that the Court of Appeals had referred Feldman's application to its Committee on Admissions for review;[47] that the Committee felt that Feldman "has had an exceptional opportunity for training and is a personable, impressive, and outstanding individual," but nevertheless had recommended unanimously that the court deny the petition;[48] and that the court had decided to accept the recommendation.[49] The Chief Judge explained:

> [T]he purpose of the rule ... is to prevent the Committee and the Court from assuming the practically impossible task of making separate subjective evaluations of each applicant's training and education; hence, an objective and reasonable standard as prescribed by the rule must be utilized.[50]

"Mr. Feldman, of course," the message concluded, "will be eligible to make an application for admission to the bar after he has completed five years of practice."[51] On the day following, the Court of Appeals—once again in a self-styled per curiam order [52] —denied Feldman's request for a waiver without additional comment.[53]

Feldman filed suit in the District Court about two months later. Like Hickey, he alleged violation of both the Fifth Amendment and the federal antitrust laws.[54] The court concluded that Feldman sought essentially a review of a judicial order which, because of counsel's letter to the Chief Judge, "fully encompassed the constitutional and statutory issues raised."[55] The court accordingly ruled that it lacked jurisdiction and dismissed the action.[56] Feldman then appealed.

### C. The Issues

Appellees press two broad objections to the District Court's jurisdiction in these cases. First, they urge that the antitrust claims advanced by appellants are frivolous, and therefore were properly dismissed for failure to raise any substantial federal question.[57] Second, appellees contend that what appellants actually seek is review of judgments of the highest court of the District of Columbia, and thus are defeated by the express congressional reservation of that authority to the Supreme Court of the United States.[58] Alternatively with respect to appellant Feldman, it is suggested that even if the District Court had jurisdiction, the doctrine of res judicata barred that court's consideration of the issues he raised therein because, it is said, the same questions were previously put to the Court of Appeals by the letter written by his counsel.[59] We consider each of these arguments in turn.

---

45. *Id.* at 5–7, F. App. 27–29.

46. Letter, Hon. Theodore R. Newman, Jr., to Robert M. Sussman, Mar. 29, 1978, F. App. 32.

47. *Id.*

48. *Id.*

49. *Id.*

50. *Id.*

51. *Id.* See D.C.App.R. 46 I(c)(3)(i) (1978). The rule no longer contains an express education requirement for reciprocity admission.

52. See text *supra* at note 22.

53. *Feldman Complaint, supra* note 33, Ex. E, F. App. 33.

54. *Id.* ¶¶ 28, 30–32, F. App. 10–12.

55. *Feldman v. Gardner,* Civ. No. 78–0957 (D.D.C. Oct. 24, 1978) (memorandum opinion) at 4, [hereinafter cited as *Feldman Order*], F. App. 50.

56. *Id.*

57. Discussed in Part II *infra.*

58. Discussed in Part III *infra.*

59. Discussed in Part IV *infra.* It is also contended that principles of comity and federalism counsel judicial restraint in these cases. Regulation of the legal profession, to be sure, is largely the province of the states and the District of Columbia, but the federal courts nevertheless have a responsibility to listen when a litigant charges constitutional or federal statutory violations. As the Supreme Court has observed,

> [w]hen a State exercises power wholly within the domain of state interest, it is insulated

## II. THE ANTITRUST CLAIMS

■ Jurisdiction to entertain federal antitrust lawsuits is vested solely in the federal courts.[60] So, whatever the nature of the proceedings in the District of Columbia Court of Appeals on appellants' waiver petitions, they unquestionably have the right to present their antitrust claims in a federal forum. The issue at the core of the antitrust charges, then, is whether appellants stated any cognizable cause of action,[61] and thus should not have suffered dismissal.

■ Mere proffer of a problem implicating the antitrust laws does not necessarily suffice, however; subject-matter jurisdiction of the federal courts is dependent upon a suit "arising under" such laws.[62] That does not occur when the "issue tendered by the complaint [is] either frivolous or so insubstantial as to be beyond the jurisdiction of the District Court." [63] In light of this principle, appellees invite us to affirm the dismissal of appellants' Sherman[64] and Clayton Act[65] claims, insisting that they are "obviously without merit." [66] The opposing contentions advanced by appellants boil the essential inquiry down to but one: May the District of Columbia Court of Appeals be sued[67] for alleged antitrust violations by reason of its adoption of a rule limiting admission to the bar examination to candidates who have completed a prescribed minimum of education in an ABA-

---

from federal judicial review. But such insulation is not carried over when state power is used as an instrument for circumventing a federally protected right.
*Reynolds v. Sims*, 377 U.S. 533, 566, 84 S.Ct. 1362, 1384, 12 L.Ed.2d 506, 530 (1964) (footnote omitted), quoting *Gomillion v. Lightfoot*, 364 U.S. 339, 347, 81 S.Ct. 125, 130, 5 L.Ed.2d 110, 117 (1960). See also note 200 *infra*.

**60.** *General Investment Co. v. Lake Shore & M. So. Ry.*, 260 U.S. 261, 287, 43 S.Ct. 106, 117, 67 L.Ed. 244, 260 (1922). See generally, J. von Kalinowski, 14 Anti-trust Laws and Trade Regulations §§ 104.01, 104.02 (1980). See 15 U.S.C. §§ 4, 25 (1976); 28 U.S.C. § 1337 (1976), *as amended by* Act of Oct. 20, 1978, Pub.L.No. 95–486, § 9(a), 92 Stat. 1633; Act of Oct. 10, 1980, Pub.L.No.96–417, 94 Stat. 1743 (1980).

The Court's "affirmance" in *Bates v. State Bar of Arizona*, 433 U.S. 350, 97 S.Ct. 2691, 53 L.Ed.2d 810 (1977)—of the decision of the Supreme Court of Arizona that its ban on lawyer advertising did not violate federal antitrust law—should not be mistaken as a recognition of state-court jurisdiction to entertain federal antitrust suits. The *Bates* plaintiffs raised an antitrust argument before the Arizona high court as a defense in a proceeding to enforce a disciplinary rule, and that court dealt with the argument for what it was—a defensive challenge to the validity of the rule, not an original antitrust action. See *Matter of Bates*, 113 Ariz. 394, 555 P.2d 640, 642 (1976). For a more complete discussion of *Bates*, see text *infra* at notes 79–81.

**61.** The District Court dismissed Feldman's federal antitrust claim on a different ground—that it had been resolved by the District of Columbia Court of Appeals and thus could be reviewed only by the Supreme Court. See *Feldman Order, supra* note 55, at 4, F. App. 50. We believe this rationale to be erroneous, both because there was no adjudication on the merits of that claim by the Court of Appeals, see Part III *infra*, and because the District Court has exclusive original jurisdiction over federal antitrust actions. See note 60 *supra*. We affirm the dismissal on the basis of the analysis set forth in text. See note 201 *supra*.

We note further that although Feldman directed his complaint against the Committee on Admissions and its secretary as well as against the Court of Appeals and its members, see note 3 *supra*, in the antitrust context we perceive no basis for a claim against the Committee. The challenged rule was promulgated by the Court of Appeals, and the Court of Appeals has the ultimate responsibility for its enforcement. The Committee's functions are limited; it acts primarily in an adversary capacity. See note 41 *supra* and note 193 *infra*. Consequently our discussion in this part addresses only the potential liability of the Court of Appeals.

**62.** See 28 U.S.C. § 1337 (1976), *as amended by* Act of Oct. 20, 1978, Pub.L.No. 95–486, § 9(a), 92 Stat. 1633; Act of Oct. 10, 1980, Pub.L.No. 96–417, tit. V, § 505, 94 Stat. 1743.

**63.** *Hagans v. Lavine*, 415 U.S. 528, 539, 94 S.Ct. 1372, 1380, 39 L.Ed.2d 577, 589 (1974). See also *Bell v. Hood*, 327 U.S. 678, 682–683, 66 S.Ct. 773, 776, 90 L.Ed. 939, 943 (1946).

**64.** Sherman Act, §§ 1, 2, 15 U.S.C. §§ 1, 2 (1976).

**65.** Clayton Act, § 4, 15 U.S.C. § 15 (1976).

**66.** *Ex parte Poresky*, 290 U.S. 30, 32, 54 S.Ct. 3, 4, 78 L.Ed. 152, 153 (1933).

**67.** See note 3 *supra*.

accredited law school? We hold that it may not.

## A. *The State Action Doctrine*

In defending against appellants' arguments, appellees have relied upon the "state action" exemption from antitrust liability. Although this doctrine originated much earlier,[68] its principal exposition came in *Parker v. Brown*,[69] decided in 1943. The Supreme Court there upheld a California program designed to restrict competition among growers in order to maintain prices in the raisin market, reasoning that the state, as "a sovereign, imposed the restraint as an act of government which the Sherman Act did not undertake to prohibit."[70] In two much more recent cases, *Goldfarb v. Virginia State Bar*[71] and *Bates v. State Bar of Arizona*,[72] the Court elaborated on the state action concept in the context of purported anticompetitive regulation of the legal profession.

 In *Goldfarb*, the Court struck down a minimum fee schedule promulgated by a county bar association under the direction of the state bar of Virginia. The Court emphasized that the state itself had not directed the issuance of the fee schedule.[73] Noting that the bar groups' "arguments, at most, constitute a contention that their activities complemented the objective of the [state's] ethical codes,"[74] the Court declared that "[i]n our view that is not state action for Sherman Act purposes."[75] Significantly for the instant cases, however, the Court stressed that "[i]n holding that certain anticompetitive conduct by lawyers is within the reach of the Sherman Act we intend no diminution of the authority of the state to regulate its professions."[76] The Court described this authority as based on the states' "compelling interest in the practice of professions within their boundaries," which gives them "broad power to establish standards for licensing practitioners in regulating the practice of professions."[77] The Court cogently observed that "[t]he interest

**68.** In *Eastern R.R. Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961), the Supreme Court traced the origin of the doctrine to *Standard Oil Co. v. United States*, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619 (1911). *Standard Oil* read the Sherman Act to "forbid[ ] only those trade restraints and monopolizations that are created, or attempted, by the acts of 'individuals or corporations.' " *Eastern R.R. Conference v. Noerr Motor Freight, Inc.*, supra, quoting *Standard Oil v. United States*, supra, 221 U.S. at 57, 31 S.Ct. at 514, 55 L.Ed. at 644. The *Noerr* opinion explained that, "accordingly, it has been held that where a restraint upon trade or monopolization is the result of valid governmental action, as opposed to private action, no violation of the Act can be made out." 365 U.S. at 136, 81 S.Ct. at 529, 5 L.Ed.2d at 470. *See United States v. Rock Royal Coop.*, 307 U.S. 533, 59 S.Ct. 993, 83 L.Ed. 1446 (1939). This interpretation apparently was first made in *Olsen v. Smith*, 195 U.S. 332, 345, 25 S.Ct. 52, 55, 49 L.Ed. 224, 230–231 (1904).

**69.** 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943).

**70.** *Id.* at 352, 63 S.Ct. at 314, 87 L.Ed. at 326–327.

**71.** 421 U.S. 773, 95 S.Ct. 2004, 44 L.Ed.2d 572 (1975).

**72.** *Supra* note 60.

**73.** 421 U.S. at 788–792, 95 S.Ct. at 2013–2016, 44 L.Ed.2d at 585–588. The county bar association was a private organization, see *id.* at 779, 790, 95 S.Ct. at 2009, 2015, 44 L.Ed.2d at 580, 586–587, and the state bar was a state agency only for limited purposes. *Id.* at 766 & n.2, 789–790, 791, 95 S.Ct. at 2007 & n.2, 2014–2015, 44 L.Ed.2d at 578 & n.2, 586–587. The Virginia legislature had authorized the Supreme Court of Appeals of Virginia to regulate the practice of law, *id.* at 789 & n.18, 95 S.Ct. at 2014 & n.18, 44 L.Ed.2d at 586 & n.18, and that court had adopted ethical codes, *id.* at 789, 95 S.Ct. at 2014, 44 L.Ed.2d at 586, but "it [could not] fairly be said that the State of Virginia through its Supreme Court Rules required the anticompetitive activities" under attack. *Id.* at 790, 95 S.Ct. at 2015, 44 L.Ed.2d at 587.

**74.** *Id.* at 791, 95 S.Ct. at 2015, 44 L.Ed.2d at 587.

**75.** *Id.*

**76.** *Id.* at 793, 94 S.Ct. at 2016, 44 L.Ed.2d at 588. Although the discussion in text focuses on the Sherman Act in our view the state-action doctrine is equally applicable to alleged violations of the Clayton Act.

**77.** *Id.* at 792, 94 S.Ct. at 2016, 44 L.Ed.2d at 588.

of the States in regulating lawyers is especially great since lawyers are essential to the primary governmental function of administering justice, and have historically been 'officers of the courts.' "[78]

In *Bates*, the Court sustained against antitrust objection a rule prohibiting advertising by lawyers. That rule, the Court found, was "the affirmative command of the Arizona Supreme Court, ... the ultimate body wielding the State's power over the practice of law."[79] Contrasting the bar-created fee schedule successfully attacked in *Goldfarb*, the Court noted that the complaint in *Bates* was not anticompetitive behavior by lawyers but a "restraint ... 'compelled by direction of the State acting as a sovereign.' "[80] Referring to its admonition in *Goldfarb* that no dilution of the states' authority to regulate their professions was intended, the Court pointed out that "[a]llowing the [*Bates*] Sherman Act challenge to the disciplinary rule would have precisely that undesired effect."[81]

■ In the cases before us, the parties have focused their arguments on the tests developed in *Parker* and its progeny for determining whether there is sufficient state action to immunize alleged anticompetitive practices. These tests require courts to ascertain whether there is a clear articulation of state policy accompanied by active supervision by the state.[82] This inquiry becomes necessary when an act by a subordinate government agency is at stake, for it is well settled that not everything it does is an act of the state as a sovereign.[83] There obviously is no need for any investigation of that sort when the action plainly is taken in a sovereign capacity. Thus in *New Mexico v. American Petrofina*,[84] the Ninth Circuit held that "a state cannot be sued for alleged violations of Sections 1 and 2 of the Sherman Act,"[85] explaining that cases like *Parker v. Brown*

> involved suits against allegedly private defendants ... or a state created corporation intended to manage a monopoly in the public interest.

> In either situation, it is necessary to determine whether the anti-competitive result actually is a goal of the state entitled to the state's immunity.... [C]ourts are understandably reluctant to apply the state's immunity to private parties without a clear indication by the state's legislature that the anti-competitive results have its sanction.

But there is no indication from those cases that the legislature must declare its intent to supplant competition in an industry when there is no question that the conduct is committed by the state.[86]

■ We agree. While activity of private parties prompted by purported state policies[87] or pursuant to state regulatory

---

**78.** *Id.*

**79.** 433 U.S. at 360, 97 S.Ct. at 2697, 53 L.Ed.2d at 821.

**80.** *Id.*

**81.** *Id.* at 360 n.11, 97 S.Ct. at 2697 n.11, 53 L.Ed.2d at 821 n.11.

**82.** *Parker v. Brown, supra* note 69, 317 U.S. at 351–352, 63 S.Ct. at 313–314, 87 L.Ed.2d at 326. See also, e. g., *California Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc.*, 445 U.S. 97, 105, 100 S.Ct. 937, 943, 63 L.Ed.2d 233, 243 (1980); *New Motor Vehicle Bd. of California v. Orrin W. Fox Co.*, 439 U.S. 96, 109–111, 99 S.Ct. 403, 412–413, 58 L.Ed.2d 361, 375–377 (1978); *City of Lafayette v. Louisiana Power & Light Co.*, 435 U.S. 389, 408–417, 98 S.Ct. 1123, 1134–1139, 55 L.Ed.2d 364, 380–385 (1978) (plurality opinion); *Cantor v. Detroit Edison Co.*, 428 U.S. 579, 592–593, 96 S.Ct. 3110,

3118–3119, 49 L.Ed.2d 1141, 1150–1151 (1976); *Schwegmann Bros. v. Calvert Distillers Corp.*, 341 U.S. 384, 389, 71 S.Ct. 745, 748, 95 L.Ed. 1035, 1045 (1951).

**83.** See cases cited *supra* note 82.

**84.** 501 F.2d 363 (9th Cir. 1974).

**85.** *Id.* at 372.

**86.** *Id.* at 369–370. To the extent that the Ninth Circuit applied this same analysis to political subdivisions we disagree. Political subdivisions are not equivalent to a state, as the Supreme Court held in *City of Lafayette v. Louisiana Power & Light Co., supra* note 82.

**87.** See, e. g., *Goldfarb v. Virginia State Bar, supra* note 71.

schemes,[88] or even acts of subordinate governmental agencies,[89] are not always entitled to the shield of the state's antitrust exemption, acts of the state in its sovereign character are invulnerable. This view of governmental immunity is traceable back to the earliest days of federal antitrust lawmaking,[90] and was reaffirmed by the Supreme Court as late as 1978. In *City of Lafayette v. Louisiana Power & Light Co.*,[91] the Court warned that it is incorrect to characterize *Parker* as holding "that all governmental entities, whether state agencies or subdivisions of a State, are, simply by reason of their status as such, exempt from the antitrust laws."[92] Proceeding with this analysis, the Court contrasted the presence of sovereign state action in *Parker* with its absence in *Goldfarb*,[93] observing that "no Virginia statute referred to lawyers' fees and the Supreme Court of Virginia had taken no action requiring the use of and adherence to minimum-fee schedules" in that case.[94] But while *Goldfarb* lacked an exertion of state sovereignty, that element was evident in *Bates*, where the Supreme Court of Arizona—"the ultimate body wielding the State's power over the practice of law"[95]—had clearly articulated and actively supervised the allegedly anticompetitive non-advertising rule there in issue.[96]

The degree of involvement of the governmental body possessing capacity to exercise a sovereign prerogative is thus crucial. In *City of Lafayette*, the Court applied this analysis to municipalities, concluding that while "states are sovereign, save only as Congress may constitutionally subtract from their authority,"[97] municipalities are not themselves sovereign, nor do they receive "the federal deference of the States that create them"[98] unless the anticompetitive activity in suit was undertaken by the municipality acting as the state's agent at the state's direction.[99] But regulation by a state legislature of admission to the state's bar clearly would stand on an entirely different footing, as does that activity when conducted by a state court endowed with the "ultimate" authority to do so.[100] In either case, the regulatory act brings to bear the sovereignty of the state, and immunity from federal antitrust liability attaches.

### B. The Status of the Court of Appeals

We are therefore confident that were the District of Columbia a state for purposes of the federal antitrust laws, its Court of Appeals would be amply shielded. But "the District of Columbia is constitutionally distinct from the States,"[101] and we do not believe that in the antitrust context it can be likened to a state. In addressing

---

**88.** See, *e. g., California Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc., supra* note 82.

**89.** See, *e. g., City of Lafayette v. Louisiana Power & Light Co., supra* note 82.

**90.** See note 68 *supra.*

**91.** *Supra* note 82.

**92.** 435 U.S. at 408, 98 S.Ct. at 1134, 55 L.Ed.2d at 380.

**93.** *Id.* at 408–410, 98 S.Ct. at 1134–1135, 55 L.Ed.2d at 379–381.

**94.** *Id.* at 409–410, 98 S.Ct. at 1135, 55 L.Ed.2d at 380–381.

**95.** *City of Lafayette v. Louisiana Power & Light Co., supra* note 82, 435 U.S. at 410, 98 S.Ct. at 1135, 55 L.Ed.2d at 381, quoting *Bates v. State Bar of Arizona, supra* note 60, 433 U.S. at 360, 97 S.Ct. at 2697, 53 L.Ed.2d at 821.

**96.** *City of Lafayette v. Louisiana Power & Light Co., supra* note 82, 435 U.S. at 410, 98 S.Ct. at 1135, 55 L.Ed.2d at 381.

**97.** *Id.* at 400, 98 S.Ct. at 1130, 55 L.Ed.2d at 374–375.

**98.** *Id.* at 412, 98 S.Ct. at 1136, 55 L.Ed.2d at 382.

**99.** *Id.* at 413, 98 S.Ct. at 1137, 55 L.Ed.2d at 383.

**100.** See *Bates v. State Bar of Arizona, supra* note 60, 433 U.S. at 360, 97 S.Ct. at 2697, 53 L.Ed.2d at 821.

**101.** *Palmore v. United States*, 411 U.S. 389, 395, 93 S.Ct. 1670, 1675, 36 L.Ed.2d 342, 350 (1973).

state-action problems in the antitrust field, the Supreme Court has repeatedly emphasized that fundamental considerations of federalism underlie the exemption doctrine.[102] Inherent in our system of government is the concept of dual sovereignty; each state is sovereign, except to the extent that its sovereignty is curtailed by the Constitution or validly restricted by Congress.[103] It is for this reason that "an unexpressed purpose [in the antitrust laws] to nullify a state's control over its officers and agents is not lightly to be attributed to Congress." [104] These basic concerns do not arise, however, with respect to the District of Columbia; despite the recent enactment of legislation giving the District greater autonomy,[105] it remains a federal enclave lacking the sovereignty inherent in statehood.

In the same breath, we reject any notion that the District of Columbia Court of Appeals is merely a municipal unit for purposes of the antitrust question posed in this litigation. It is a creature, not of the District of Columbia Government, but of Congress itself; [106] it is "[t]he highest court of the District of Columbia," whose "[f]inal judgments and decrees . . . are reviewable by the Supreme Court of the United States," [107] as are those of the state courts of last resort.[108] As such, the Court of Appeals is the final arbiter of local law,[109] and is specifically vested by Congress with the power to regulate admissions to the District of Columbia bar.[110] Authority of this type and scope is not enjoyed by courts of municipalities.

In short, the District of Columbia cannot be characterized as a state in relation to the federal antitrust laws. It is, rather, a semi-autonomous governmental unit, an entity unique in our governmental structure. But whatever the status of the District's legislative and executive branches in the hierarchy of antitrust exemption, the Court of Appeals is plainly a federal instrumentality armed with the supreme judicial power over nonfederal subject matter in the District. We are mindful that on a prior occasion we held that the District of Columbia Armory Board, set up by Congress expressly to provide a stadium for District of Columbia sports teams, was not immune from antitrust liability.[111] The Armory Board, however, was commissioned to operate that facility as a private venture,[112] a mission entirely different from that of the Court of Appeals. The court was established by Congress to head the local judiciary in an indispensable function of government,[113] and was invested with powers vir-

102. See cases cited *supra* note 82.

103. *City of Lafayette v. Louisiana Power & Light Co., supra* note 82, 435 U.S. at 400, 98 S.Ct. at 1130, 55 L.Ed.2d at 374–375.

104. *Id.* See *Parker v. Brown, supra* note 69, 317 U.S. at 351, 63 S.Ct. at 313, 87 L.Ed. at 326.

105. See, e. g., District of Columbia Court Reorganization Act of 1970, Pub.L.No. 91–358, tit. I, § 111, 84 Stat. 475, D.C.Code §§ 11–101 *et seq.* (1973) [hereinafter cited as codified]; District of Columbia Self-Government and Governmental Reorganization Act, Pub.L.No.93–198, 87 Stat. 774 (1973) (codified variously).

106. D.C.Code §§ 11–701 to 11–743 (1973).

107. D.C.Code § 11–102 (1973).

108. 28 U.S.C. § 1257 (1976). See, however, *Key v. Doyle*, 434 U.S. 59, 98 S.Ct. 280, 54 L.Ed.2d 238 (1977); *Palmore v. United States, supra* note 101.

109. See *Church of Scientology v. Foley*, 205 U.S.App.D.C. 364, 372 n.63, 640 F.2d 1335, 1343 n.63 (dissenting opinion), *cert. denied,* —— U.S. ——, 101 S.Ct. 3110, 69 L.Ed.2d 972 (1980); *Thompson v. United States*, 179 U.S. App.D.C. 76, 80, 548 F.2d 1031, 1035 (1976).

110. D.C.Code § 11–2501(a) (1973), quoted in text *infra* at note 117.

111. *Hecht v. Pro-Football, Inc.*, 144 U.S.App. D.C. 56, 444 F.2d 931 (1971), *cert. denied,* 404 U.S. 1047, 92 S.Ct. 701, 30 L.Ed.2d 736 (1972).

112. *Id.* at 71, 444 F.2d at 944.

113. Congress created and endowed jurisdictionally the District of Columbia courts. No less than those courts, the federal courts here and across the Nation owe their existence and authority to Congress. From the viewpoint of government in the District, tribunals possessing jurisdiction over nonfederal matters was as much a sheer necessity as tribunals handling federal judicial business. Congress deliberate-

tually identical to those of the highest courts of the states.[114] The Court of Appeals is not a governmental entity simply substituting for private enterprise, nor one seeking refuge merely in the fact that it is a governmental instrumentality.[115]

Without a doubt, the Court of Appeals has the same compelling interest as a state supreme court in regulating the bar of its jurisdiction. While we would not lightly attribute to Congress a desire to counter the important objectives of the federal antitrust policies, we have great difficulty in imagining an intent to disturb the traditional authority of courts to meet one of their most vital needs—determining who will be admitted to practice before them as court officers.[116] Here Congress issued a clear legislative mandate:

> The District of Columbia Court of Appeals shall make such rules as it deems proper respecting the examination, qualification, and admission of persons to membership in its bar, and their censure, suspension, and expulsion.[117]

Responding to the directive of this legislation, the court, by conditioning admission to the bar examination upon educational attainment in an ABA-approved law school,

acts no differently than the vast majority of states in the constant effort to assure the public that members of the bar are qualified lawyers.[118] And "[s]ince the founding of the Republic, the licensing and regulation of lawyers has been left exclusively to the States and the District of Columbia within their respective jurisdictions." [119] It would fly in the face of congressional intent in conferring this broad and essential regulatory authority upon the court to rule that it could become exposed to antitrust liability when it exercises it.

We hold that the Court of Appeals—as "the ultimate body wielding [governmental] power over the practice of law" in the District of Columbia [120]—acts in a sovereign governmental capacity—as sovereign as an exertion of judicial power can ever be—when it sets and enforces educational prerequisites for admission to the bar examination. It may be that appellants could have sued ABA, if indeed that organization engages in anticompetitive behavior and thereby inflicts injury upon them.[121] They cannot, however, subject the Court of Appeals to a charge of antitrust violation. We affirm the dismissal of appellants' antitrust claims.

ly chose to establish the two systems of courts in the District, *Palmore v. United States, supra* note 101, 411 U.S. at 406–407, 93 S.Ct. at 1681, 36 L.Ed.2d at 357, and each discharges in its own sphere the essential judicial functions of government as much as the other.

**114.** See text *supra* at notes 107–110.

**115.** Thus, the position of the Court of Appeals is far different from that of the Armory Board in *Hecht*; the court engages in governmental actions of far greater importance. See 144 U.S.App.D.C. at 72, 444 F.2d at 947. Nor is the situation of the Court of Appeals merely that of a federal regulator of industry, the antitrust status of which normally is to be analyzed on a case-by-case basis. See *City of Lafayette v. Louisiana Power & Light Co., supra* note 82, 435 U.S. at 398–399, 98 S.Ct. at 1129, 55 L.Ed.2d at 374; *United States v. Philadelphia Nat'l Bank*, 374 U.S. 321, 350–351 & n.28, 83 S.Ct. 1715, 1734–1735 & n.28, 10 L.Ed.2d 915, 937 & n.28 (1963) (collecting cases). See also

*Hecht v. Pro-Football, Inc., supra* note 111, 144 U.S.App.D.C. at 67–69, 444 F.2d at 942–944.

**116.** See *Goldfarb v. State Bar of Virginia, supra* note 71, 421 U.S. at 792, 95 S.Ct. at 2016, 44 L.Ed.2d at 588.

**117.** D.C.Code § 11–2501(a) (1973).

**118.** See note 7 *supra*.

**119.** *Leis v. Flynt*, 439 U.S. 438, 442, 99 S.Ct. 698, 700, 58 L.Ed.2d 717, 722 (1979).

**120.** See *Bates v. State Bar of Arizona, supra* note 60, 433 U.S. at 360, 97 S.Ct. at 2697, 53 L.Ed.2d at 821.

**121.** Compare *Marjorie Webster Junior College, Inc. v. Middle States Ass'n of Colleges & Secondary Schools*, 139 U.S.App.D.C. 217, 432 F.2d 650, *cert. denied*, 400 U.S. 965, 91 S.Ct. 367, 27 L.Ed.2d 384 (1970); *Paralegal Inst., Inc. v. ABA*, 475 F.Supp. 1123 (E.D.N.Y.1979), *aff'd* 622 F.2d 575 (2d Cir. 1980).

## III. THE CONSTITUTIONAL CLAIMS

### A. *Jurisdictional Considerations*

More than a century ago the Supreme Court, in *Ex Parte Secombe*,[122] recognized as even then "well-settled" the principle that a court has exclusive authority "to determine who is qualified to become one of its officers, as an attorney and counsellor. . . ."[123] Never over the many years since *Secombe* has this thesis been seriously challenged, nor has the related proposition that admission to a state's bar normally is a nonfederal matter. Yet the litigation before us is not disposed of merely by invocation of this broad regulatory power. Its exercise, like any other exertion of governmental authority, is subject to the commands of the Constitution, and redress for infringements of rights the Constitution guarantees ordinarily may be sought in the federal courts.[124] The propriety of resort to those courts after an earlier proceeding in a nonfederal court must be considered in light of established criteria, and this is the second task that the instant appeals summon us to perform.

 The problem before us—whether the District Court was empowered to enter-tain the claims appellants founded on the Constitution—is multifaceted, and thus calls for step-by-step treatment. To begin with, while "[i]t is a principle of first importance that the federal courts are courts of limited jurisdiction,"[125] there can be no doubt that with respect to those claims appellants met the minimum requirements for federal-question jurisdiction.[126] The threshold requirements with regard to subject matter are satisfied when 'the right of the [plaintiff] to recover under [the] complaint will be sustained if the Constitution and laws of the United States are given one construction and will be defeated if they are given another."[127] That indisputably was the situation here. The amount in controversy prescribed by statute was established by appellants' good-faith valuation of the rights they assert, for definitely it did not "appear[ ] to a legal certainty that the claims [were] really for less than the jurisdictional amount . . . ."[128] Moreover, the jurisdictional amount is no longer a prerequisite to suits in which a "federal question" is at issue.[129] As appellees urge, however, in some instances prospective plaintiffs must clear additional jurisdictional obstacles if they are to bring suit in a

**122.** 60 U.S. (19 How.) 9, 15 L.Ed. 565 (1857).

**123.** *Id.* at 13, 15 L.Ed. at 565.

**124.** See note 59 *supra.*

**125.** C. Wright, *Federal Courts* § 7, at 17 (3d ed. 1976). See also *Owen Equip. & Erection Co. v. Kroger,* 437 U.S. 365, 374, 98 S.Ct. 2396, 2403, 57 L.Ed.2d 274, 282 (1978).

**126.** See 28 U.S.C. § 1331(a) (Supp. III 1979) ("[t]he district courts shall have original jurisdiction of all civil actions wherein the matter in controversy exceeds the sum or value of $10,-000, exclusive of interest and costs, and arises under the Constitution, laws, or treaties of the United States"). The jurisdictional-amount requirement has now been eliminated. Federal Question Jurisdictional Amendments Act of 1980, Pub.L.No.96–486, 94 Stat. 2369. See note 129 *infra.*

**127.** *Bell v. Hood, supra* note 63, 327 U.S. at 685, 66 S.Ct. at 777, 90 L.Ed. at 944. See *Wheeldin v. Wheeler,* 373 U.S. 647, 649, 83 S.Ct. 1441, 1444, 10 L.Ed.2d 605, 610 (1963); *Gully v. First Nat'l Bank,* 299 U.S. 109, 112–113, 57 S.Ct. 96, 97, 81 L.Ed. 70, 72 (1936).

**128.** *Gibbs v. Buck,* 307 U.S. 66, 72, 59 S.Ct. 725, 729, 83 L.Ed. 1111, 1115 (1939); *St. Paul Mercury Indem. Co. v. Red Cab Co.,* 303 U.S. 283, 288, 58 S.Ct. 586, 590, 82 L.Ed. 845, 848 (1938); *Smithers v. Smith,* 204 U.S. 632, 642, 27 S.Ct. 297, 299, 51 L.Ed. 656, 660 (1907); *Hartigh v. Latin,* 158 U.S.App.D.C. 289, 293, 485 F.2d 1068, 1071 (1973), *cert. denied, District of Columbia v. Marsh,* 415 U.S. 948, 94 S.Ct. 1470, 39 L.Ed.2d 564 (1974); *Gomez v. Wilson,* 155 U.S.App.D.C. 242, 251, 477 F.2d 411, 420 (1973). Unless good faith appears to be lacking the sum claimed by the plaintiff controls.

**129.** As noted above, the jurisdictional amount was eliminated by Congress late in 1980. See note 126 *supra.* We recently held that this amendment to § 1331 applies retroactively to cases pending on appeal. *Eikenberry v. Callahan,* 653 F.2d 632, 636 (D.C.Cir.1981).

federal district court,[130] and such a barrier confronts appellants here.

 Review of a final judgment of the highest judicial tribunal of a state is vested solely in the Supreme Court of the United States.[131] In 1970, Congress extended this exclusivity to judgments of the newly-reconstituted District of Columbia Court of Appeals.[132] Accordingly, we are in complete agreement with appellees that the District Court is powerless to reexamine determinations by the Court of Appeals in judicial proceedings.[133] But whether, for purposes of ascertaining the jurisdiction of a federal court, a particular proceeding before another tribunal was truly judicial is a question of federal law, calling for close inspection of its features.[134] We conclude that the instant actions fell within the District Court's jurisdiction because, we find, the Court of Appeals' dispositions of appellants' waiver petitions emanated from proceedings that were not judicial in that sense.

**B.** *The Characteristics of Judicial Proceedings*

Not every effort pursued in court is judicial in quality. Many years ago in *Prentis v. Atlantic Coast Line Co.*[135] the Supreme Court emphasized that a determination of whether a tribunal has acted in a judicial capacity turns on the character of the proceeding and the nature of its outcome, rather than on the circumstance that the decisionmaking body was "at another moment, or in its principal or dominant aspect, . . . a court . . . ."[136] And, as we shall now see, *Prentis* is also highly instructive on other aspects of the core issue before us.

*Prentis* involved a constitutional assault in a federal circuit court on an order of the State Corporation Commission of Virginia which, under the state's constitution and statutes, was "clothed with legislative, judicial and executive powers,"[137] and thus functioned at least part of the time as a judicial body.[138] The Virginia constitution provided that an appeal from a ratemaking order of the Commission could be taken only to the state's highest court, which was

---

**130.** "Constitutional power is merely the first hurdle that must be overcome. . . . For the jurisdiction of the federal courts is limited not only by the provisions of Art. III of the Constitution, but by Acts of Congress." *Owen Equip. & Erection Co. v. Kroger, supra* note 125, 437 U.S. at 372, 98 S.Ct. at 2402, 57 L.Ed.2d at 281. See *Palmore v. United States, supra* note 101, 411 U.S. at 401, 93 S.Ct. at 1678, 36 L.Ed.2d at 353–354; *Lockerty v. Phillips,* 319 U.S. 182, 187, 63 S.Ct. 1019, 1022, 87 L.Ed. 1339, 1342–1343 (1943); *Kline v. Burke Constr. Co.,* 260 U.S. 226, 233–234, 43 S.Ct. 79, 82–83, 67 L.Ed. 226, 231–232 (1922).

**131.** 28 U.S.C. § 1257 (1976):
Final judgments or decrees rendered by the highest court of a State in which a decision could be had, may be reviewed by the Supreme Court as follows: . . .
(3) By writ of certiorari, where the validity of a treaty or statute of the United States is drawn in question or where the validity of a State statute is drawn in question on the ground of its being repugnant to the Constitution, treaties or laws of the United States, or where any title, right, privilege or immunity is specially set up or claimed under the Constitution, treaties or statutes of, or commission held or authority exercised under, the United States.

**132.** The District of Columbia Court Reform and Criminal Procedure Act, Pub.L.No.91–358, § 172(a)(1), 84 Stat. 590 (1970), added at the end of 28 U.S.C. § 1257, quoted *supra* note 131, the following language: "For the purposes of this section, the term 'highest court of a State' includes the District of Columbia Court of Appeals," a position previously filled by this court. See *Church of Scientology v. Foley,* 640 F.2d 1335, at 1343 n.63 (D.C.Cir.1981) (dissenting opinion); *Thompson v. United States, supra* note 109, 179 U.S.App.D.C. at 80, 548 F.2d at 1035.

**133.** Brief for Appellees in No. 78–2235 at 36.

**134.** See *In re Summers,* 325 U.S. 561, 566, 65 S.Ct. 1307, 1310–1311, 89 L.Ed. 1795, 1800 (1945), and cases there cited. See also cases cited *infra* note 200.

**135.** 211 U.S. 210, 29 S.Ct. 67, 53 L.Ed. 150 (1908).

**136.** *Id.* at 226, 29 S.Ct. at 69, 53 L.Ed. at 158.

**137.** *Id.* at 224, 29 S.Ct. at 68, 53 L.Ed. at 158.

**138.** *Id.* at 225–226, 29 S.Ct. at 69, 53 L.Ed. at 158.

empowered to substitute its own order if it found the challenge meritorious.[139] The *Prentis* litigation arose when the Commission established rates deemed confiscatory by affected railroads.[140]

The railroads' suit was resisted on the theory that in promulgating the rates the Commission acted as a court of the state, and that its order thus was statutorily immune from a lower federal court's injunction.[141] The Supreme Court disagreed, holding that the ratemaking proceeding before the Commission was legislative and not judicial.[142] Sharply differentiating between the two, the Court explained:

> A judicial inquiry investigates, declares and enforces liabilities as they stand on present or past facts and under laws supposed already to exist. That is its purpose and end. Legislation on the other hand looks to the future and changes existing conditions by making a new rule to be applied thereafter to all or some part of those subject to its power. The establishment of a rate is the making of a rule for the future, and therefore is an act legislative, not judicial, in kind....

**139.** *Id.* at 224–225, 29 S.Ct. at 68–69, 53 L.Ed. at 158.

**140.** *Id.* at 223, 225, 29 S.Ct. at 68, 69, 53 L.Ed. at 157, 158.

**141.** *Id.* at 223, 29 S.Ct. at 68, 53 L.Ed. at 157. See Act of Mar. 2, 1793, ch. 22, § 5, 1 Stat. 335, as amended, 28 U.S.C. § 2283 (1976). See also note 142 *infra*.

**142.** *Id.* at 226–228, 29 S.Ct. at 69–70, 53 L.Ed. at 158–159. The concern of the *Prentis* Court was the familiar Anti-Injunction Act, which originally was phrased to outlaw injunctions "to stay proceedings in any court of a state." Act of Mar. 2, 1793, ch. 22, § 5, 1 Stat. 335. In *Prentis'* era, the Act provided:

> The writ of injunction shall not be granted by any court of the United States to stay proceedings in court of a State, except in cases where such injunction may be authorized by any law relating to proceedings in bankruptcy.

Rev.Stat. § 720 (1874). In current text, the Act specifies:

> A court of the United States may not grant an injunction to stay proceedings in a State court except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments.

28 U.S.C. § 2283 (1976). The term "proceedings" is to be read broadly as "includ[ing] all steps taken or which may be taken in the state court or by its officers from the institution to the close of the final process," *Hill v. Martin*, 296 U.S. 393, 403, 56 S.Ct. 278, 282, 80 L.Ed. 293, 298–299 (1935), and the statutory bar not only endures while the proceedings are in progress, but also defies circumvention by "prohibiting utilization of the results of a completed state court proceeding." *Atlantic Coast Line R.R. v. Brotherhood of Locomotive Eng'rs*, 398 U.S. 281, 287, 90 S.Ct. 1739, 1743, 26 L.Ed.2d 234, 241 (1970); see also *Hill v. Martin*, *supra*, 296 U.S. at 403, 56 S.Ct. at 278, 80 L.Ed. at 293; *In re Glenn W. Turner Enterprises*

*Litigation*, 521 F.2d 775, 779 (3d Cir. 1975). But the Act immunizes only proceedings "in a State court," hence the need to ask whether in those proceedings the tribunal was acting judicially. See *Roudebush v. Hartke*, 405 U.S. 15, 21–22, 92 S.Ct. 804, 808–809, 31 L.Ed.2d 1, 9–10 (1972); *Public Serv. Co. v. Corboy*, 250 U.S. 153, 161–162, 39 S.Ct. 440, 441–442, 63 L.Ed. 905, 909 (1919); *Prentis v. Atlantic Coast Line Co.*, *supra* note 135, 211 U.S. at 226–228, 29 S.Ct. at 69, 53 L.Ed. at 159; *Armstrong v. Maple Leaf Apartments*, 508 F.2d 518, 523 (10th Cir. 1974).

The scope of the inquiry appropriate in the cases at bar is not widened by appellees' contention that appellants' sole recourse was to the Supreme Court. For a half-century it has been settled that the Court cannot engage in the decision of questions of an administrative character, but only of those in such form that the judicial power is capable of acting upon them. *Keller v. Potomac Elec. Power Co.*, 261 U.S. 428, 444, 43 S.Ct. 445, 449, 67 L.Ed. 731, 736 (1923); *Federal Radio Comm'n v. General Elec. Co.*, 281 U.S. 464, 469, 50 S.Ct. 389, 390–391, 74 L.Ed. 969, 972 (1930); *id.* at 469–470, 50 S.Ct. at 390–391, 74 L.Ed. at 972 (noting that jurisdiction exercised in suits to set aside orders of the Interstate Commerce Commission and the Federal Trade Commission "is not administrative, but strictly judicial, and therefore quite unlike jurisdiction exercised on appeals from the Radio Commission"); *id.* at 470, 50 S.Ct. at 391, 74 L.Ed. at 972 (describing the proceeding there under review as "not a case or controversy in the sense of the judiciary article, but ... an administrative proceeding, and therefore the decision therein is not reviewable by this Court"). See also *Federal Radio Comm'n v. Nelson Bros. Bond & Mortgage Co.*, 289 U.S. 266, 274–278, 53 S.Ct. 627, 631–633, 77 L.Ed. 1166, 1172–1175 (1933). Consequently, the District Court's jurisdiction here hangs on the answer to the question posed identically in *Prentis*: was the proceeding in the local tribunal judicial?

Proceedings legislative in nature are not proceedings in a court within the meaning of [the anti-injunction statute], no matter what may be the general or dominant character of the body in which they may take place. . . . That question depends not upon the character of the body but upon the character of the proceedings. . . .[143]

Equally important to the cases before us, the *Prentis* Court made clear that a nonjudicial proceeding does not become judicial simply because it addresses the same questions that might have been developed in a judicial action involving the identical subject matter:

[I]t does not matter what inquiries may have been made as a preliminary to the legislative act. . . . [T]he effect of the inquiry, and of the decision upon it, is determined by the nature of the act to which the inquiry and decision lead up. . . . [S]o when the final act is legislative the decision which induces it cannot be judicial in the practical sense, although the questions considered might be the same that would arise in the trial of a case.[144]

And the Court left no doubt that these principles apply not only to an administrative agency but also to a full-fledged court engaged in a nonjudicial proceeding:

[The state court's] action in [confirming the rate] would not have been judicial, although the questions debated by it might have been the same that might come before it as a court, and would have

been discussed and passed upon by it in the same way that it would deal with them if they arose afterwards in a case properly so called.[145]

Since deciding *Prentis*, the Supreme Court has reaffirmed the distinction between judicial and nonjudicial actions, not only in the ratemaking context in which the problem originally arose[146] but in other areas as well.[147] For example, in *Public Service Co. v. Corboy*,[148] faced with the question whether a federal district court could enjoin allegedly unconstitutional action of a state court engaged in construction contracting, the Supreme Court drew upon the *Prentis* rationale:

[A]lthough the Constitution did not limit the power of the States to create courts and to confer upon them such authority as might be deemed best for state purposes, that right could not, by its exertion, restrain or limit the power of the courts of the United States by bringing within the state judicial authority subjects which in their constitutional sense were non-judicial in character and therefore not within the implied or express limitation by which courts of the United States were restrained from staying judicial proceedings in state courts. To hold to the contrary would be in large measure to recognize that the exertion of the authority of the courts of the United States was dependent, not upon the nature and character of the subject-matter with

**143.** 211 U.S. at 226, 29 S.Ct. at 69, 53 L.Ed. at 158–159.

**144.** *Id.* at 227, 29 S.Ct. at 70, 53 L.Ed. at 159.

**145.** *Id.*

**146.** *E. g., Terminal R.R. Ass'n v. United States,* 266 U.S. 17, 30, 45 S.Ct. 5, 8, 69 L.Ed. 150, 156 (1924); *Louisville & N. R.R. v. Garrett,* 231 U.S. 298, 307, 34 S.Ct. 48, 51–52, 58 L.Ed. 229, 240 (1913).

**147.** *E. g., Roudebush v. Hartke, supra* note 142, 405 U.S. at 20–23, 92 S.Ct. at 808–809, 31 L.Ed.2d at 8–10 (1972); *In re Summers, supra* note 134, 325 U.S. at 567, 65 S.Ct. at 1311, 89 L.Ed. at 1800. *Public Serv. Co. v. Corboy, supra* note 142, 250 U.S. at 161–162, 39 S.Ct. at

441–442, 63 L.Ed. at 909; *Armstrong v. Maple Leaf Apartments, supra* note 142, 508 F.2d at 523; *Central Elec. & Gas Co. v. City of Stromsburg,* 192 F.Supp. 280, 295 (D.Neb.1960), *aff'd,* 289 F.2d 217 (8th Cir. 1961); *Virginia Nat'l Bank v. Virginia ex rel. State Corp. Comm'n,* 320 F.Supp. 260, 265–266 (E.D.Va.1970), *appeal dismissed,* 448 F.2d 425 (4th Cir. 1971). See also cases cited *supra* note 142. And see *Lathrop v. Donohue,* 367 U.S. 820, 827, 81 S.Ct. 1826, 1829–1830, 6 L.Ed.2d 1191, 1196 (1961) (state court's promulgation of rules and bylaws creating integrated state bar "had the characteristics of legislation").

**148.** *Supra* note 142.

which they are called upon to deal, but merely upon a state classification.[149]

Similarly, in *Roudebush v. Hartke*,[150] the Supreme Court reversed a federal district court's refusal to enjoin implementation of a state court's decision to hold a recount in a federal election pursuant to a state statute purporting to make the new reckoning mandatory when certain prerequisites were met. The Court rejected the argument that the state body was a judicial entity against which no injunction could issue from a lower federal court, stating:

> The exercise of these limited responsibilities does not constitute a court proceeding ... within the test of *Prentis*: ... The state courts' duties in connection with a recount may be characterized as ministerial, or perhaps administrative, but they clearly do not fall within this definition of a "judicial inquiry." [151]

■ These decisions make it evident that the waiver denials at issue in the cases at bar did not become judicial orders simply because the tribunal issuing them ordinarily functions as a court. Nor is the fact that the Court of Appeals' pronouncement on the waiver petitions were denominated per curiam orders dispositive; the teaching of *Prentis* is that the character of the proceed-

ings is decisive. Thus, "[t]he nature of the final act," and not the nature of the issue, "determines the nature of the previous inquiry;" and only orders which declare or enforce rights and liabilities rise to the level of judicial action.[152]

In an effort to bolster the proposition that appellants should have gone from the Court of Appeals to the Supreme Court rather than to the District Court, appellees place heavy reliance on the Supreme Court's decision in *In re Summers*,[153] the only case in which the Court has addressed the mutual exclusivity of its direct-review authority and district-court jurisdiction over action in the bar-admission context.[154] Summers, an applicant for admission to the Illinois bar, was denied a certificate of fitness by the character committee of the state's highest court because he had been a conscientious objector during World War II.[155] Summers then asked the court to overturn the committee's decision, protesting the ruling as transgressing on the First and Fourteenth Amendments.[156] The court declined to do so, whereupon Summers sought a writ of certiorari from the Supreme Court.[157]

The justices of the Illinois high court opposed the writ, arguing that Summers'

**149.** 250 U.S. at 162, 39 S.Ct. at 442, 63 L.Ed. at 909.

**150.** *Supra* note 142.

**151.** 405 U.S. at 21, 92 S.Ct. at 809, 31 L.Ed.2d at 9.

**152.** *Prentis v. Atlantic Coast Line Co., supra* note 135, 211 U.S. at 227, 29 S.Ct. at 69, 53 L.Ed. at 158. See text *supra* at notes 143–144.

**153.** *Supra* note 134. Several decisions by federal courts of appeals are also invoked, but all appear to us to be inapposite. See note 200 *infra*.

**154.** Contrary to arguments made to us, the Supreme Court has never held that any and all types of state-court action regarding admission to the bar are automatically of a judicial character and therefore reviewable only by the Supreme Court. Reliance on *Ex parte Garland*, 71 U.S. (4 Wall.) 333, 18 L.Ed. 366 (1867), for that proposition is misplaced. Although the *Garland* Court described the admission of attorneys to the bar as an exercise of judicial

power, it was not called upon, as we are on these appeals, to ascertain the proper forum for review of such decisions. When faced with the necessity of determining whether particular action is judicial, and hence immune from reexamination by lower federal district courts, the Supreme Court has stressed the nature of the inquiry and the relief sought. See text *supra* at notes 141–152 and text *infra* at note 164.

**155.** *In re Summers, supra* note 134, 325 U.S. at 562–563, 65 S.Ct. at 1308–1309, 89 L.Ed. at 1797–1798.

**156.** *Id.* at 563–564, 65 S.Ct. at 1309, 89 L.Ed. at 1798. "The petition set out that the sole reason for the Committee's refusal was that [Summers] was a conscientious objector to war, and averred that such reason did not justify his exclusion because of the due process clause of the Fourteenth Amendment." *Id.* at 564, 65 S.Ct. at 1309, 89 L.Ed. at 1798.

**157.** *Id.* at 562, 65 S.Ct. at 1308, 89 L.Ed. at 1797.

petition had not inaugurated a judicial proceeding involving a case or controversy, but was simply an application for Summers' appointment as an officer of the court.[158] The Supreme Court disagreed, however, and consented to review the Illinois court's decision,[159] though ultimately sustaining it on the merits.[160] It is to this grant of certiorari, and the concomitant finding that the proceeding in the Illinois court was judicial, that appellees point as the ground for their contention that only the Supreme Court can now hear appellants' claims.

The Supreme Court began its analysis in *Summers* by reiterating that "[a] case arises, within the meaning of the Constitution, when any question respecting the Constitution, treaties or laws of the United States has assumed 'such a form that the judicial power is capable of acting on it.' "[161] Amplifying this point, the Court then restated, in language only slightly different from the original, the *Prentis* test: "The form of the proceeding is not significant. It is the nature and effect which is controlling." [162] The Court found that the proceeding before the Illinois court was an adversary one because it sought relief expressly against the assertedly unconstitutional action of the character committee.[163] The Court concluded that "[a] claim of a present right to admission to the bar of a state and a denial of that right is a controversy," [164] and in Summers' instance was reviewable on writ of certiorari.[165] For reasons now to be explained, we think *Summers* does not govern here, and that the attempt to attribute judiciality to the proceedings·in the Court of Appeals must fail.

At the very outset, the suggestion that the Court of Appeals' orders were products of judicial proceedings seems strange.[166]

**158.** *Id.* at 564–565, 65 S.Ct. at 1310, 89 L.Ed. at 1799.

**159.** *Id.* at 565–569, 65 S.Ct. at 1310–1312, 89 L.Ed. at 1799–1801.

**160.** *Id.* at 569–573, 65 S.Ct. at 1312–1314, 89 L.Ed. at 1802–1803.

**161.** *Id.* at 566–567, 65 S.Ct. at 1311, 89 L.Ed. at 1800, quoting *Osborn v. Bank of United States*, 22 U.S. (9 Wheat.) 738, 819, 6 L.Ed. 204, 223 (1824).

**162.** 325 U.S. at 567, 65 S.Ct. at 1311, 89 L.Ed. at 1800. The court did not actually cite *Prentis*, but pointed instead to *Nashville, C. & St. L. Ry. v. Wallace*, 288 U.S. 249, 53 S.Ct. 345, 77 L.Ed. 730 (1933), which had expressed the test as follows: "In determining whether this litigation presents a case within the appellate jurisdiction of this Court, we are concerned, not with form, but with substance." *Id.* at 259, 53 S.Ct. at 346, 77 L.Ed. at 733.

**163.** *In re Summers, supra* note 134, 325 U.S. at 567–568, 65 S.Ct. at 1311–1312, 89 L.Ed. at 1800–1801.

**164.** *Id.* at 568, 65 S.Ct. at 1312, 89 L.Ed. at 1801.

**165.** *Id.* at 568–569, 65 S.Ct. at 1312, 89 L.Ed. at 1801. See *Willner v. Committee on Character & Fitness*, 373 U.S. 96, 102, 83 S.Ct. 1175, 1179, 10 L.Ed.2d 224, 229 (1963).

**166.** As appellants have aptly observed, the procedures followed in the Court of Appeals seem, to say the least, unorthodox for any matter really considered by a court under the auspices of its judicial authority. No docket entry was made; there apparently was no opportunity for submission of evidence; no formal hearing was held; no record was compiled; and there were no opposing parties in the classic sense. Brief for Appellant Hickey at 20–24, 35; Brief for Appellant Feldman at 48. Even more surprising, given appellees' insistent characterization of the proceedings as judicial, the court itself initiated an ex parte contact with ABA in an effort to assess the validity of the antitrust allegations raised by Feldman. See Letter, Alexander L. Stevas, Clerk, District of Columbia Court of Appeals, to Frederick R. Franklin, Staff Director, Section on Legal Education and Admissions to the Bar, American Bar Association, April 26, 1978, H.App. 105.

While certain, though, that distinctions may be drawn between these cases and *Summers*, we are advertent to the admonition that the mere form of the proceeding is not of controlling significance. See text *supra* at note 162. The fact that the court deviated from customary judicial procedure has obvious bearing on the question whether appellants' waiver proceedings were truly judicial, but standing alone it did not render them nonjudicial. "[T]he circumstances of the refusal" also are relevant, *In re Summers, supra* note 134, 325 U.S. at 566, 65 S.Ct. at 1310–1311, 89 L.Ed. at 1800; see *Brooks v. Laws, supra* note 4, 92 U.S.App.D.C. at 376, 208 F.2d at 27, but they do not necessarily convert the proceeding from judicial to nonjudicial, as *Summers* itself illustrates. The crucial question remains, as *Prentis* instructs, whether the final act was judicial in nature. See text *supra* at note 144.

More seriously, it runs directly counter to *Prentis'* admonition that an inquiry is judicial in nature only when it is utilized as the medium for "investigat[ing], declar[ing] and enforc[ing] liabilities." [167] The critical question is whether appellants presented the Court of Appeals with "[a] claim 'of a present right to admission to the bar," [168] without which the proceedings therein decidedly could not have been judicial.[169] We think the answer plainly is that they did not, and that therein lies the most decisive of the differences between these cases and *Summers.*[170]

C. *The Nature of the Proceedings Before the District of Columbia Court of Appeals*

Examination of appellants' petitions to the Court of Appeals for waivers of Rule 46 I(b) discloses immediately that neither asserted any sort of *right* to be admitted to the District of Columbia bar, or even to take the examination therefor. Instead, each petition asked the court to do no more than except the petitioner from the operation of the rule. And while the petitions were tendered to a court and concerned admission to the bar, neither circumstance rendered them judicial. In *Ktsanes v. Underwood,*[171] the Seventh Circuit held flatly that a petition requesting a state court to waive one of its rules on bar admission sought "ministerial action, not judicial determination," [172] and that the ensuing denial of the petition "was made by the court acting in an administrative capacity." [173]

We are satisfied that the same conclusion follows here.

The validity of these observations with respect to appellant Hickey is readily apparent; for him, as did the Seventh Circuit for the bar candidate in *Ktsanes,* we can easily say that "we have exactly the opposite set of circumstances" [174] from those present in *Summers.* And while appellant Feldman's situation is somewhat less clear, it calls for a similar outcome.[175]

As earlier noted, Hickey conceded the applicability of Rule 46 I(b) to him.[176] He entreated the Court of Appeals to grant an exemption because of his substantive qualifications, unique background, reasonable expectations that he would be allowed to take the bar examination, and general equitable considerations based on his age, service to his country, and family status.[177] He presented no legal arguments whatsoever, nor did he demand admission to the examination as a matter of legal entitlement. In short, he merely asked the court to exercise its administrative discretion to permit him to take the test. The court was thus solicited to make a policy decision equating his personal qualities with accredited legal education, not an adjudication requiring resort to legal principles.[178] Thus, Hickey's request can hardly be viewed as "[a] claim of a present right to admission to the bar," [179] or to the examination affording the opportunity therefor.

**167.** *Prentis v. Atlantic Coast Line Co., supra* note 135, 211 U.S. at 226, 29 S.Ct. at 69, 53 L.Ed. at 158; see *Roudebush v. Hartke, supra* note 147, 405 U.S. at 21, 92 S.Ct. at 809, 31 L.Ed.2d at 9; *Chandler v. Judicial Council of the Tenth Circuit,* 398 U.S. 74, 106, 90 S.Ct. 1648, 1665, 26 L.Ed.2d 100, 120 (1970) (Harlan, J., concurring in denial of certiorari); *cf. In re Summers, supra* note 134, 325 U.S. at 568, 65 S.Ct. at 1312, 89 L.Ed. at 1801 (judicial proceeding must involve claim and denial of right).

**168.** See text *supra* at note 164.

**169.** See text *supra* at notes 143, 164.

**170.** See note 200 *infra.*

**171.** *Ktsanes v. Underwood,* 552 F.2d 740 (7th Cir. 1977), *cert. denied,* 435 U.S. 933, 98 S.Ct. 1508, 55 L.Ed.2d 530 (1978).

**172.** *Id.* at 743.

**173.** *Id.*

**174.** *Id.*

**175.** See text *infra* at notes 180–200.

**176.** See text *supra* at notes 17–20.

**177.** See Hickey Petition, *supra* note 17, at 2–5, H.App. at 18–21.

**178.** Hickey's case thus differs critically from Summers'. See note 164, *supra,* and accompanying text.

**179.** See text *supra* at note 164. As the Seventh Circuit emphasized in the analogous case of *Ktsanes v. Underwood, supra* note 171, the applicant for waiver

Although at first glance appellant Feldman's case appears more difficult, we are no less convinced that the claim-of-right element was likewise lacking, as a single contrast points up. As the Supreme Court stated, Summers' "petition set out that the sole reason for the Committee's refusal was that [Summers] was a conscientious objector to war, and averred that such reason did not justify his exclusion because of the due process clause of the Fourteenth Amendment." [180] On the other hand, Feldman's petition to the Court of Appeals did not claim that a refusal of his waiver request would deny him any right at all. Rather, the petition invoked the administrative discretion of that body, simply asking that it temper its rule in his favor, for personal and not legal reasons.

We are mindful that the letter subsequently written by Feldman's counsel discussed his constitutional and antitrust positions, but we are not persuaded that it changed the essential nature of his effort in the Court of Appeals. The letter was written after a period of almost nine months of apparent inactivity on the waiver petition,[181] and put the court on notice of possible legal infirmities in the rule and of Feldman's intent to litigate them in federal court should his request to sit for the bar examination not be promptly granted.[182] We are unable to discern in the letter any desire that the court consider Feldman's legal criticisms of the rule on their merits, or hand down a decision dealing with them.[183] The letter made unmistakably clear that these criticisms would be litigat-

---

never argued the question of the validity of [the rule] before the [highest court of the jurisdiction]. He was asking for ministerial action, not judicial determination. The denial of his petition was made by the court acting in an administrative capacity. *See Law Students [Civil Rights] Research Council v. Wadmond*, 401 U.S. 154, 158 n.9, 91 S.Ct. 720, [724 n.9,] 27 L.Ed.2d 749, [756 n.9] (1961) .... That denial did not present a case or controversy cognizable by an Article III court, and, thus, was not appealable to the Supreme Court of the United States.

552 F.2d at 743. It is noteworthy, too, that the *Summers* Court mentioned, as examples of nonjudicial proceedings, "the appointment of a clerk or bailiff or *the specification of the requirements of eligibility or the course of study for applicants for admission to the bar....*" *In re Summers, supra* note 134, 325 U.S. at 566, 65 S.Ct. at 1310–1311, 89 L.Ed. at 1800 (emphasis supplied).

**180.** *In re Summers, supra* note 134, 325 U.S. at 564, 65 S.Ct. at 1309–1310, 89 L.Ed. at 1798.

**181.** See text *supra* at notes 42–44.

**182.** See text *supra* at note 45. While, in an effort toward simplicity, we discuss the cases of both Feldman and Hickey in terms of their requests for permission to sit for the District of Columbia bar examination, it should be recalled that Feldman's petition to the Court of Appeals sought waiver of the educational requirements for purposes of reciprocity admission as well. See text *supra* at notes 40–53. Subsection (c) of Rule 46 I at that time provided for admission of members of state bars without the five-year practice requirement that is not ordinarily mandatory. Compare D.C.

App.R. 46 I(c) (1975) with D.C.App.R. 46 I(c) (1978). We view both branches of Feldman's petition in the same light, and the considerations we elaborate are equally applicable to each. As with respect to the bar examination prerequisite, the pivotal factors are first that Feldman avowed no claim of right or entitlement to bar admission under the reciprocity provision, and second that, acknowledging the rule's applicability to him, he sought waiver of the educational requirement rather than an adjudication of his admissibility to the bar. While ordinarily bar admission ventures result in judicial proceedings, see note 200 *infra*, and while the end result of Feldman's waiver request if successful would have been reciprocity admission, his petition, fairly read, was a supplication for a discretionary dispensation rather than a legal demand for admission.

**183.** The letter plainly identified its objective:

As we understand it, ... the Committee on Admissions has advised Mr. Feldman that Rule 46I bars him from even taking the D.C. bar examination because he is not a graduate of an A.B.A. accredited law school.... Under Section 11–2501 of the District of Columbia Code, the Court has plenary power to regulate the licensing of attorneys in the District. This power plainly includes the discretion to waive the requirements of Rule 46 in a deserving case. Clearly, Mr. Feldman's unusually high qualifications for admission provide an ideal occasion for the exercise of such discretion.

Letter, Robert M. Sussman to Hon. Theodore R. Newman, Jr., *supra* note 44, at 3, F.App. 25. See *Feldman Petition, supra* note 42, at 5, F.App. 21.

ed, if at all, in the District Court; [184] and surely for the antitrust problems highlighted in the letter there was no alternative, since exclusive jurisdiction to consider them is vested in the federal courts.[185]

Hence, we would encounter no difficulty even were we to credit appellees' contention that the letter, in purpose and practical effect, advanced new arguments in aid of Feldman's earlier petition for the waiver. It would seem unreasonable, and indeed counterproductive, to hold that those situated comparably to appellants could never point out what they believe to be legal flaws in bar-admission rules from which they seek waivers on grounds of policy. On the contrary, it is in keeping with the respect and deference due the judiciary that would-be litigants be encouraged to take all problems concerning bar admission first to the courts having responsibility for that function.[186] This is perhaps even more desirable when a regulation affecting membership in a state or local bar threatens to precipitate a lawsuit in a federal court.

Nor do we see any reason why a party seeking merely an exemption from a court-imposed rule of that kind need bifurcate policy and legal arguments helpful to his request therefrom. It has been settled since *Prentis* that one vieing for a tribunal's nonjudicial resolution of a matter may assert his full views thereon without transforming the nature of the proceeding from nonjudicial to judicial.[187] *Prentis* teaches that nonjudicial action—even of a court—"would not have been judicial, although the questions debated by it might have been the same that might come before it as a court, and would have been discussed and passed upon by it in the same way that it would deal with them if they arose afterwards in a case properly so called." [188] For, *Prentis* explains, "the effect of the inquiry, and of the decision upon it, is determined by the nature of the act to which the inquiry and decision lead up," [189] and "when the final act is [nonjudicial], the decision which induces it cannot be judicial in the practical sense, although the questions considered might be the same that would arise in the trial of a case." [190]

Feldman confined his effort in the Court of Appeals to a request for a waiver—not adjudication of the validity—of the rule requiring legal education in ABA-approved schools, and the court's order did not go beyond the limited scope of that request. The order, we have said, was distinctly nonjudicial in character,[191] and it matters not that the court may have considered—as presumably it did—whatever reflections Feldman's constitutional and antitrust stance cast upon the waiver question.

Thus we view Feldman's petition, even as augmented by his counsel's letter, as solely "one for exemption from the rule, not a challenge of it." [192] The Court of Appeals was not requested to review the decision of

**184.** *Id.* at 7, F.App. 29.

**185.** See notes 60–61 *supra* and accompaning text.

**186.** In *England v. Louisiana State Bd. of Medical Examiners,* 375 U.S. 411, 84 S.Ct. 461, 11 L.Ed.2d 440 (1964), the Court made plain that at least in the abstention context, when a litigant goes into a state court for an authoritative ruling on the applicability of a state regulation in his case, he is not barred from thereafter raising his constitutional objections in a federal court, *even though he has already raised them in the state court,* when he did so before the state tribunal only "so that the statute may be construed 'in light of' those claims." *Id.* at 420, 84 S.Ct. at 467, 11 L.Ed.2d at 448, citing Note, *Consequences of Abstention by a Federal Court,* 73 Harv.L.Rev. 1358, 1364–1365 (1960). On the contrary, the Court, citing *Government & Civic Employees Organizing Comm. v. Wind-*

*sor,* 353 U.S. 364, 366, 77 S.Ct. 838, 839, 1 L.Ed.2d 894, 896 (1957), held that the state court *must* be informed of those claims and given the opportunity to construe the state provision in their light before the federal court will pass on them. 375 U.S. at 419–422, 84 S.Ct. at 467, 468, 11 L.Ed.2d at 447–448.

**187.** See text *supra* at notes 143–144.

**188.** See text *supra* at note 145.

**189.** See text *supra* at note 144.

**190.** See text *supra* at note 144.

**191.** See text *supra* at note 183.

**192.** *Ktsanes v. Underwood, supra* note 171, 552 F.2d at 743.

any other body—indeed, no other entity had the power to grant an exemption [193]—or to originate a decision of its own. To be sure, Feldman argued vigorously that he should be relieved of the requirement of Rule 46 I(b), and predicated part of his reasoning on a perception that the rule was unjust in its application to him and possibly was unlawful. But it made sense to communicate those views for whatever value they had on the matter of waiver, and in any event that sort of communication did not alter the fundamental nature of his endeavor. The vital point is that Feldman did not seek, nor did the court make, any determination respecting the validity of the rule; he merely asked the Court of Appeals to relieve him from it, and expressly reserved his legal claims for possible adjudication on another day in another forum.[194]

Moreover, the proceedings before the Court of Appeals can hardly be said to have cast the constitutional and antitrust questions in "such a form that the judicial power [was] capable of acting on [these issues]." [195] Appellants, we repeat, did not challenge the validity of the rule, but, as in *Ktsanes*, "ask[ed] for ministerial action, not judicial determination." [196] We thus conclude congruently with *Ktsanes* that "[t]he denial of [their] petition[s] was made by the court acting in an administrative capacity," [197] for the court was not in position to act in any other way. And we further agree that "that denial did not present a case or controversy cognizable by an Article III court and, thus, was not appealable to the Supreme Court of the United States." [198]

**193.** Both cases at bar differ materially from *Summers* in this respect. While the Illinois bar committee, like its counterpart in the District of Columbia, served the court in an advisory capacity, *In re Summers, supra* note 134, 325 U.S. at 567–568, 65 S.Ct. at 1311–1312, 89 L.Ed. at 1801, the former had independent authority that the latter lacked. The Illinois committee was empowered to deny certificates of fitness, and in fact it denied one to Summers on grounds he challenged as unconstitutional. *Id.* at 569 n.10, 65 S.Ct. at 1312 n.10, 89 L.Ed. at 1801–1802 n.10. The proceeding in the Illinois high court was thus a review of the committee's action resulting in a decision on the merits. *Id.* at 567–568, 65 S.Ct. at 1311–1312, 89 L.Ed. at 1801. The District of Columbia Committee, on the other hand, had no authority to act on appellants' requests save by recommendation to the Court of Appeals, and it did not purport to do otherwise; rather, the action complained of was in each instance the court's own. Thus, in these cases, unlike *Summers*, we do not have a situation wherein "relief is ... sought in a [nonfederal] court against the action of a committee, appointed to advise the court." *Id.*

**194.** Letter, Robert M. Sussman to Hon. Theodore R. Newman, Jr., *supra* note 44, at 7, F.App. 29.

**195.** See *In re Summers, supra* note 134, 325 U.S. at 566–567, 65 S.Ct. at 1311, 89 L.Ed. at 1800; text *supra* at note 161.

**196.** *Ktsanes v. Underwood, supra* note 171, 552 F.2d at 743.

**197.** *Id.* On this basis, we distinguish *Dasher v. Supreme Court of Texas*, 650 F.2d 711 (1981). There a graduate of an unapproved law school moved for leave to file in that court

a petition for an exemption to the court's bar-admission rules, characterizing the petition as "an original proceeding within the exclusive jurisdiction of the Supreme Court [of Texas]" and asking that the petition "be filed and that the cause be placed upon the docket, and that the petition be acted upon by the Court." *Id.* at 713. This request was actively opposed, thus giving the proceeding an adversary quality; and the court placed the petition on its docket and subsequently denied it on the merits. *Id.* In this fashion the court disposed, not of a mere solicitation of an equitable waiver, but of a positive demand for legal relief; the petitioner "claim[ed] that she was, as of that time, entitled to be admitted to the bar examination and that she had, even as of that time, a right to be admitted to the practice of law on the same terms and conditions as other applicants if she passed the examination." *Id.* at 715. Indeed, the Fifth Circuit itself found, as a ground for differentiation, that while in *Ktsanes* "the Illinois Supreme Court had acted in an administrative capacity rather than a judicial one," in *Dasher* "[t]he Texas Supreme Court proceedings bore the form as well as the substance of judicial proceedings." *Id.* at 717. We think *Dasher* and the case at bar mark the same disparity.

**198.** *Ktsanes v. Underwood, supra* note 171, 552 F.2d at 743. We note that in each of the major bar admission cases in which the Supreme Court has discussed its jurisdiction, the constitutional issues considered had been raised and argued below. *In re Summers, supra* note 134, came to the Court only after the petitioner had sought to have the Illinois Supreme Court overturn the decision of a committee of the state bar on constitutional grounds. Similarly, in *Konigsberg v. State Bar of California*, 353 U.S.

In sum, our analysis of these cases in light of the relevant precedent constrains us to hold that in each instance the prior proceedings before the Court of Appeals were of a nonjudicial character, and therefore did not produce in either a judgment reviewable by the Supreme Court.[199] It follows that appellants' suits in the District Court were jurisdictionally appropriate for consid-

eration and disposition of their constitutional claims.[200]

## IV. THE RES JUDICATA CLAIMS

Because we find that the District Court had jurisdiction over the subject matter of these lawsuits, we must reach appellees' alternative argument that, in the case of appellant Feldman, consideration of the

252, 77 S.Ct. 722, 1 L.Ed.2d 810 (1957), the Court expressly noted that it was granting certiorari because the petitioner had repeatedly asserted his constitutional claims throughout his hearings before the state's committee of bar examiners and had stated them again in his petition for review before the California Supreme Court. See also *In re Griffiths*, 413 U.S. 717, 718, 93 S.Ct. 2851, 2853, 37 L.Ed.2d 910, 913 (1973) (litigation on constitutional issue began in state trial court and proceeded to state supreme court); *Law Students Civil Rights Research Council v. Wadmond, supra* note 179, 401 U.S. at 158 n.9, 91 S.Ct. at 724 n.9, 27 L.Ed.2d at 755–756 n.9 (noting that three-judge district court was properly convened to hear constitutional challenge to state bar-admission requirement, and pointing out, without stating its opinion on the matter, that three-judge court held that "the courts and the justices were acting in an administrative capacity"); *Baird v. State Bar of Arizona*, 401 U.S. 1, 5, 91 S.Ct. 702, 705, 27 L.Ed.2d 639, 646 (1971) (plurality opinion) (Arizona court denied petition for and order that state bar committee show cause why admission should not be granted despite applicant's refusal to answer question concerning prior contact with organizations advocating government's overthrow); *Willner v. Committee on Character and Fitness, supra* note 165, 373 U.S. at 102, 83 S.Ct. at 1179, 10 L.Ed.2d at 228–229 (constitutional questions were briefed and argued before state court). Other cases dealing with bar admission have not made clear whether the constitutional issues were argued in the state court, but they also have not discussed the jurisdictional questions at all.

199. To the extent relevant here, the doctrine of judicial immunity from suit for damages buttresses our holding. In that context, the Court recently declared that "the factors determining whether an act by a judge is a 'judicial' one relate to the nature of the act itself . . . and to the expectations of the parties, *i. e.*, whether they dealt with the judge in his judicial capacity." *Stump v. Sparkman*, 435 U.S. 349, 362, 98 S.Ct. 1099, 1107, 55 L.Ed.2d 331, 342 (1978). We have held that appellants did not seek or subject themselves to judicial action by the Court of Appeals, and their expectations of purely nonjudicial rulings by the court militate in favor of federal jurisdiction of their lawsuits.

200. The decisions upon which appellees chiefly rely are readily distinguishable. Cases precipitated by disciplinary proceedings against lawyers, *e. g., Grossgold v. Supreme Court of Illinois*, 557 F.2d 122 (7th Cir. 1977); *Jones v. Hulse*, 391 F.2d 198 (8th Cir.), *cert. denied*, 393 U.S. 889, 89 S.Ct. 206, 21 L.Ed.2d 167 (1968), are inapposite because the proceedings challenged therein culminated in adjudications on the right to engage in law practice. *Randall v. Brigham*, 74 U.S. (7 Wall.) 523, 535, 19 L.Ed. 285, 293 (1869) (judge disbarring attorney acts judicially, and thus is immune to resulting damage suit); *Ex parte Secombe, supra* note 122, 60 U.S. (19 How.) at 15, 15 L.Ed. at 566 (decision to disbar is "in its nature a judicial act"); *Erdmann v. Stevens*, 458 F.2d 1205, 1208 (2d Cir. 1972) (state court's "conduct of disciplinary proceedings with respect to those admitted to practice before it amounts to a judicial inquiry"); *Saier v. State Bar of Michigan*, 293 F.2d 756, 760 (6th Cir.), *cert. denied*, 368 U.S. 947, 82 S.Ct. 388, 7 L.Ed.2d 343 (1961) ("[i]n the final analysis, it is a judicial function to pass on the disbarment of a lawyer"); *Mildner v. Gulotta*, 405 F.Supp. 182 (E.D.N.Y.1975) (three-judge court), *aff'd*, 425 U.S. 901, 96 S.Ct. 1489, 47 L.Ed.2d 751 (1976) ("we must view disciplinary proceedings as *judicial* rather than *administrative* in nature") (emphasis supplied). See also *In re Ruffalo*, 390 U.S. 544, 550, 88 S.Ct. 1222, 1225–1226, 20 L.Ed.2d 117, 121–122 (1968); *Charlton v. FTC*, 177 U.S.App.D.C. 418, 421, 543 F.2d 903, 906 (1976). We detect no element of judiciality in the disposition of appellants' entreaties for dispensation of Rule 46 I(b), not on legal grounds but wholly as a matter of administrative grace.

Nor does *Doe v. Pringle*, 550 F.2d 596 (10th Cir. 1976), *cert. denied*, 431 U.S. 916, 97 S.Ct. 2179, 53 L.Ed.2d 227 (1977) aid the position espoused by appellees. Doe twice sought and obtained rulings—albeit adverse—by the Supreme Court of Colorado on his application for admission to the bar, *id.* at 596–597, and thereafter initiated litigation that was, "in essence, an attempt by Doe to seek review in inferior federal courts of the *entire* state proceedings, including the order of the Colorado Supreme Court refusing to grant his second application for admission." *Id.* at 599 (emphasis in original). We are in full agreement with the observation that "[t]he action of the Colorado court

legal issues that he sought to raise in the District Court was barred by principles of res judicata.[201] We reject this contention.

Stripped to its essence, appellees' position is that the letter from Feldman's counsel to the Court of Appeals [202] incorporated the same questions of law that arose in his action in the District Court; that these questions had already been finally decided by the Court of Appeals; and that therefore they could not be relitigated in Feldman's lawsuit.[203] Undeniably, the doctrine of res judicata prohibits a state court litigant defeated in a judicial proceeding from seeking an encore in a federal forum.[204] But the attempt to apply the doctrine of res judicata to Feldman's case proceeds from a faulty premise; it assumes that the Court of Appeals' action in denying his waiver request was judicial in character, and that proposition we have already rejected.[205] As the Supreme Court noted in *Prentis*, "[t]he decision upon [nonjudicial questions] cannot be res judicata when a suit is brought.... And it does not matter what inquiries may

have been made as a preliminary to the [nonjudicial] act." [206] Since we hold that the proceeding in the Court of Appeals was nonjudicial in nature, its outcome cannot be res judicata in a subsequent judicial action.[207] Accordingly, we cannot sustain the dismissal of Feldman's suit on this alternative ground.

## V. SUMMARY

Lest our decision be interpreted too broadly, we pause to summarize precisely what we have said. In these cases, appellants petitioned the District of Columbia Court of Appeals only to waive on their behalf one of its requirements for admission to the bar. They did not seek review by the Court of Appeals of the decision of any other body or individual; they did not request the court to invalidate any rule; nor did they ask for anything as a matter of right. Consequently, the orders of the Court of Appeals denying the petitions were administrative, not judicial, in nature. In this milieu, given that appellants' constitutional claims are not insubstantial, the District Court had jurisdiction over the sub-

---

was judicial rather than administrative," *id.* at 604 (Breitenstein, J., concurring in result), a characterization the Court of Appeals' action in the present cases does not fit. Moreover, neither Feldman nor Hickey now seek review of the waiver proceedings in the Court of Appeals, or the court's decision on waiver. See note 24 *supra*. Instead, each challenges on antitrust and constitutional grounds the administration of Rule 64 I(b) and the validity of the rule itself. These cases thus differ from *Brown v. Board of Bar Examiners of the State of Nevada*, 623 F.2d 605 (9th Cir. 1980), which held the district court to be without jurisdiction to entertain a challenge to a state court's decision not to waive a rule similar to the rule at issue in the instant case. Although acknowledging that "federal district courts may assert jurisdiction ... to ensure that generally applicable rules or procedures do not impinge on constitutionally protected rights," *id.* at 609, the Ninth Circuit ruled that there is no jurisdiction to hear a lawsuit based on the theory that the state court had arbitrarily and capriciously refused to waive the rule. *Id.* at 609–610. We do not reach that question in this case.

**201.** Brief for Appellees in No. 78–2235 at 54–61. It is of course well established that a decision under review will be affirmed if it is correct even though "the lower court relied upon a wrong ground or gave a wrong reason." *Helvering v. Gowran*, 302 U.S. 238, 245, 58

S.Ct. 154, 158, 82 L.Ed. 224, 230 (1937). See *Brown v. Allen*, 344 U.S. 443, 459, 73 S.Ct. 397, 408, 97 L.Ed. 469, 490 (1953); *SEC v. Chenery Corp.*, 318 U.S. 80, 88, 63 S.Ct. 454, 459, 87 L.Ed. 626, 633 (1943); *International Union, UAW v. National Right to Work Legal Defense & Educ. Foundation, Inc.*, 192 U.S.App.D.C. 23, 35, 590 F.2d 1139, 1151 (1978).

**202.** See text *supra* at notes 44–45.

**203.** Because we uphold the antitrust dismissals, we have no occasion to address the more difficult question whether the fact that federal district courts have exclusive jurisdiction over Sherman Act claims means that a state court's decision in a suit under the Act cannot be res judicata in a subsequent action in the proper federal forum. *Cf. DeWitt Motor Co. v. Chrysler Motors Corp.*, 391 F.2d 912 (6th Cir. 1968) (no res judicata); *Cream Top Creamery v. Dean Milk Co.*, 383 F.2d 358 (6th Cir. 1968) (same).

**204.** *Angel v. Bullington*, 330 U.S. 183, 190–191, 67 S.Ct. 657, 661, 91 L.Ed. 832, 837–838 (1947); see *Cromwell v. County of Sac*, 94 U.S. (4 Otto) 351, 24 L.Ed. 195 (1877); *Reiter v. Universal Marion Corp.*, 112 U.S.App.D.C. 68, 299 F.2d 449 (1962).

**205.** See text *supra* at notes 199–200.

**206.** *Prentis v. Atlantic Coast Line Corp.*, *supra* note 135, 211 U.S. at 227, 29 S.Ct. at 69, 53 L.Ed. at 159.

**207.** See *id.*

ject matter of both actions, and the doctrine of res judicata interposes no bar to the continued prosecution of either. Of course, we intimate no view on the ultimate disposition of these issues on the merits. Appellants' antitrust contentions, however, are without merit and were properly dismissed.

The judgments appealed from are reversed, and the cases are remanded for further proceedings consistent with this opinion.

*So ordered.*

ROBB, Circuit Judge, concurring in part, dissenting in part:

I.

I agree that the antitrust claims must be dismissed. They are frivolous. The Supreme Court has held that the antitrust statutes do not apply to a restraint imposed by the state acting as sovereign. *Parker v. Brown,* 317 U.S. 341, 352, 63 S.Ct. 307, 314, 87 L.Ed. 315 (1943); *Bates v. State Bar of Arizona,* 433 U.S. 350, 363, 97 S.Ct. 2691, 2698, 53 L.Ed.2d 810 (1977). In this case the District of Columbia Court of Appeals acting *en banc* entered orders denying Hickey's and Feldman's petitions to waive provisions of the court's rules. (Hickey J.A. 35; Feldman J.A. 33) Any restraint imposed by the rules was therefore compelled by direction of the state. I am not impressed by the appellants' argument that the Court of Appeals has simply adopted rules recommended by the American Bar Association and thus authorized the Bar Association's competitive activity. The rules are those of the court, and they are enforced by the court, not by the Bar Association. That the court has adopted a standard of the Bar Association as a convenient measure of an applicant's qualifications does not mean that the court has abdicated its authority in favor of the Bar Association.

II.

In my opinion the District Court had no jurisdiction to review the order of the District of Columbia Court of Appeals.

The District of Columbia Code Title 11, § 102 provides:

The highest court of the District of Columbia is the District of Columbia Court of Appeals. Final judgments and decrees of the District of Columbia Court of Appeals are reviewable by the Supreme Court of the United States in accordance with section 1257 of title 28, United States Code. (July 29, 1970, Pub.L. 91–358 § 111, title I, 84 Stat. 475)

The Court of Appeals thus has the status of a state supreme court. *Key v. Doyle,* 434 U.S. 59, 64, 98 S.Ct. 280, 283, 54 L.Ed.2d 238 (1977). The adverse decisions in the appellants' cases were reviewable in the Supreme Court of the United States. Although the appellants cast their petitions to the Court of Appeals in terms of requests for waivers, the petitions in essence were demands that the court declare the petitioners qualified to sit for the bar examination. Those demands were denied by *en banc* orders of the Court of Appeals. The denials were judicial acts and as such were reviewable on writ of certiorari to the Supreme Court. They were not reviewable in the District Court. *In Re Summers,* 325 U.S. 561, 568–69, 65 S.Ct. 1307, 1311–12, 89 L.Ed. 1795 (1945); *Grossgold v. Supreme Court of Illinois,* 557 F.2d 122, 125 (7th Cir. 1977); *Doe v. Pringle,* 550 F.2d 596, 599 (10th Cir. 1976), *cert. denied,* 431 U.S. 916, 97 S.Ct. 2179, 53 L.Ed.2d 227 (1977); *Mackay v. Nesbett,* 285 F.Supp. 498, 502 (D.Alaska 1968); *aff'd,* 412 F.2d 846 (9th Cir.), *cert. denied,* 396 U.S. 960, 90 S.Ct. 435, 24 L.Ed.2d 425 (1969).

In the *Summers* case the Supreme Court held, 325 U.S. 568–69, 65 S.Ct. 1311–12:

A claim of a present right to admission to the bar of a state and a denial of that right is a controversy. When the claim is made in a state court and a denial of the right is made by judicial order, it is a case which may be reviewed under Article III of the Constitution when federal questions are raised and proper steps taken to that end, in this Court. [Footnote omitted]

I can see no difference in principle, so far as review in the Supreme Court is concerned, between denial of a claim of present right

to admission to the bar, on the one hand, and denial of a claim that the appellants are presently qualified to take the bar examination.

### III.

By the District of Columbia Court Reform and Criminal Procedure Act of 1970, 84 Stat. 473, Congress established " 'a Federal-State court system in the District of Columbia analagous to court systems in the several States.' " H.R.Rep.No.91–907, p. 35 (1970), *quoted in Key v. Doyle, supra,* 434 U.S. at 64, 98 S.Ct. at 283. As part of this scheme Congress provided, 84 Stat. 521, D.C.Code § 11–2501(a):

> The District of Columbia Court of Appeals shall make such rules as it deems proper respecting the examination, qualification, and admission of persons to membership in its bar, and their censure, suspension, and expulsion.

The decision of the majority sanctions an intrusion by the federal courts into what Congress plainly intended to be the prerogative of the District of Columbia court. I think this is unfortunate. It is especially unfortunate in cases such as these in which candidates for admission to the bar are challenging the judgment of the District of Columbia Court of Appeals that they are not qualified to take the bar examination. In my opinion that kind of controversy should not be the business of the United States District Court.[1]

I would affirm both judgments.

---

1. Although I think we should not reach the merits of the plaintiffs' claims, it may be noted that the requirement of graduation from an ABA approved law school as a prerequisite to admission to the bar has been adopted in 33 states and the District of Columbia and has been uniformly upheld against legal challenge. *See Brown v. Bd. of Bar Examiners,* 623 F.2d 605 (9th Cir. 1980); *Lombardi v. Tauro,* 470 F.2d 798 (1st Cir. 1972), *cert. denied,* 412 U.S. 919, 93 S.Ct. 2734, 37 L.Ed.2d 145 (1973); *Hackin v. Lockwood,* 361 F.2d 499 (9th Cir. 1966), *cert. denied,* 385 U.S. 960, 87 S.Ct. 396, 17 L.Ed.2d 305 (1966); *Louis v. Supreme Court of Nevada,* 490 F.Supp. 1174 (D.Nev.1980); *Moore v. Supreme Court of South Carolina,* 447 F.Supp. 527, *aff'd,* 577 F.2d 735 (4th Cir.), *cert. denied,* 439 U.S. 984, 99 S.Ct. 574, 58 L.Ed.2d 655 (1978); *Ostroff v. New Jersey Supreme Court,* 415 F.Supp. 326 (D.N.J.1976); *Potter v. New Jersey Supreme Court,* 403 F.Supp. 1036 (D.N.J.1975); *Application of Urie,* 617 P.2d 505 (Alaska 1980); *In re Stephenson,* 511 P.2d 136 (Alaska 1973); *Rosenthal v. State Bar Examining Committee,* 116 Conn. 409, 165 A. 211 (1933); *Hansen v. Minnesota Bd. of Bar Examiners,* Minn., 275 N.W.2d 790 (1978), *appeal dismissed for want of substantial federal question,* 441 U.S. 938, 99 S.Ct. 2154, 60 L.Ed.2d 1040 (1979); *Ralston v. Turner,* 141 Neb. 556, 4 N.W.2d 302 (1942); *Petition of Batten,* 83 Nev. 265, 428 P.2d 195 (1967); *In re Lorring's Petition,* 75 Nev. 330, 340 P.2d 589 (1959); *Henington v. State Bd. of Bar Examiners,* 60 N.M. 393, 291 P.2d 1108 (1956); *Murphy v. Pennsylvania State Bd. of Bar Examiners,* 482 Pa. 43, 393 A.2d 369 (1978), *cert. denied,* 440 U.S. 901, 99 S.Ct. 1204, 59 L.Ed.2d 449 (1979); *Application of Schatz,* 80 Wash.2d 604, 497 P.2d 153 (1972).

usage" involved in use of the base year method, maj. op. at 1342. Quite the opposite is true—the base year allocations are already in place in individual pipeline curtailment plans and would remain generally static whereas the administrative complications of keeping up with constantly fluctuating and expanding "current requirements" are truly mind staggering.